The PRESBYTERIAN CHURCH OF SUDAN, Rev. John Sudan Gaduel, Nuer Community Development Services in U.S.A., Stephen Kuina, Fatuma Nyawang Garbang, and Daniel Wour Cluol, on behalf of all others similarly situated, Plaintiffs,

v.

TALISMAN ENERGY, INC. and the Republic of the Sudan, Defendants.

No. 01 CIV.9882 (AGS).

United States District Court, S.D. New York.

March 19, 2003.

Carey D'Avino, Stephen A. Whinston, Berger & Montague, P.C., Philadelphia, PA, Lawrence Kill, Linda Gerstel, Anderson Kill & Olick, P.C., New York City, for Plaintiffs.

Joseph Cyr, Clifford Chance Rogers & Wells, New York City, for Defendants.

## *OPINION*

SCHWARTZ, District Judge.

### I. Introduction

Plaintiffs, current and former residents of the Republic of the Sudan ("Sudan" or "Government"), bring this purported class action against Talisman Energy, Inc. ("Talisman") and Sudan, alleging violations of international law stemming from oil exploration activities conducted in that country. Specifically, plaintiffs allege that defendants collaborated to commit gross human rights violations, including extrajudicial killing, forcible displacement, war crimes, confiscation and destruction of property, kidnapping, rape, and enslavement. Collectively, plaintiffs claim that these activities amount to genocide. Talisman moves to dismiss this action on the basis of lack of subject matter jurisdiction, lack of personal jurisdiction, lack of plaintiffs' standing, *forum non conveniens*, international comity, act of state doctrine, political question doctrine, failure to join necessary and indispensable parties, and because equity does not require a useless act. For the reasons set forth below, Talisman's motion to dismiss is denied.

---

**1.** The facts are drawn from plaintiffs' Amended Class Action Complaint. For purposes of contemplating dismissal, the Court is obligated to accept plaintiffs' allegations as true.

**2.** The term "ethnic cleansing" emerged from the tragedy in the former Yugoslavia and is a translation of the Serbo–Croatian term, *etničko čiš ćenje*. It is commonly understood to be a euphemism for genocide. Unlike genocide, however, "ethnic cleansing" is not a legal term of art; therefore, the Court uses quotation marks when citing the term.

**3.** Extrajudicial killing is " 'a deliberate killing' not authorized by the judgment of a court 'affording all the judicial guarantees which are recognized as indispensable by civilized peoples.' " *Wiwa v. Royal Dutch Petroleum*

### II. Factual Background[1]

#### A. Overview

This action arises out of the alleged activities of Talisman in southern Sudan. Plaintiffs claim that Talisman, a large Canadian energy company, collaborated with Sudan in "ethnically cleansing" civilian populations surrounding oil concessions located in southern Sudan in order to facilitate oil exploration and extraction activities. *See* Amended Class Action Complaint ("Amended Complaint"), at ¶ 1. This policy of "ethnic cleansing"[2] was aimed at non-Muslim, African residents of southern Sudan, and entailed extrajudicial killing[3], forced displacement, military attacks on civilian targets, confiscation and destruction of property, kidnappings, rape, and the enslavement of civilians. *See id.* at ¶ 1. In order to understand the current conflict in context, the Court presents some background information on Sudan and its turbulent history.

#### B. Geography and Population[4]

Sudan is a large African country roughly a quarter of the size of the United States. Its current population is approximately 37 million people[5], of which seventy percent are Sunni Muslim, a quarter practice in-

---

*Co.*, 226 F.3d 88, 105 n. 11 (2d Cir.2000) (quoting 28 U.S.C. § 1350 App.).

**4.** The information in this section is drawn from the CIA 2002 World Factbook, *available at* http://www.cia.gov/cia/publications/factbook/geos/su.html, and is presented solely for background purposes. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir.2002) ("on a motion to dismiss, a court may consider [...] matters of which judicial notice may be taken [...].").

**5.** In their Amended Complaint, plaintiffs estimate Sudan's population to be 32 million. In light of the ongoing civil war, no reliable estimate of the nation's population is available.

digenous religions, and five percent are Christian. Most Muslims, who are predominantly of Arabic ethnicity, live in the north of the country; most non-Muslims, who are predominantly of African ethnicity, live in the south. The north-south conflict that has wracked Sudan for years has played out predominantly along these religious and ethnic lines.

## C. History [6]

Sudan historically existed as a collection of small, independent kingdoms and principalities. In 1820–21, Egypt conquered and unified the northern portion of the country. While claiming all of present-day Sudan, Egypt was unable to establish effective control over southern Sudan, which remained largely fragmented. A religious leader, Muhammad ibn Abdalla, after unifying some of the tribes of western and central Sudan, led a nationalist revolt which culminated in the fall of Khartoum in 1885. Ibn Abdalla died thereafter, but the state survived until the arrival of an Anglo–Egyptian force under Lord Kitchener in 1898. For the next fifty years, Sudan was jointly administered by Britain and Egypt.[7] With the consent of Egypt and Britain, Sudan achieved independence on January 1, 1956. The United States was among the first nations to recognize the new state. However, the Arab-controlled Khartoum government backtracked on a promise it had made to create a federal system. As a result, southern units of the Sudanese army mutinied, sparking seventeen years of civil war (1955–1972).[8]

The 1972 Addis Ababa agreement led to a temporary cessation in the north-south civil war. Under the terms of the agreement, southern Sudan was granted a degree of self-rule. In 1976, the religious "Ansars" ("followers") staged an unsuccessful coup attempt. Sudanese president Col. Gaafar Muhammad Nimeiri met with Ansar leader Sadiq al-Mahdi. The result of the negotiations between the government and the Ansars was a general amnesty and a release of political prisoners. In 1983, President Nimeiri declared his intention to transform Sudan into a Muslim Arab state and began to incorporate traditional Islamic punishments drawn from *Shari'a* (Islamic Law) into the Sudanese penal code. Al–Mahdi questioned President Nimeiri's credentials to Islamicize Sudanese society, and was promptly placed under house arrest. President Nimeiri declared a state of emergency, and *Shari'a* was applied more broadly. Amputations for theft and public lashings for alcohol possession became common. Southern, non-Muslim Sudanese living in the north were also subject to *Shari'a*. In light of these developments, the civil war, in abeyance since 1972, reignited.

In 1986, elections were held and a transitional military council turned over power

---

6. The historical overview is drawn from the Amended Complaint, ¶¶ 10–15 and U.S. Department of State, *Background Note: Sudan,* available at http://www.state.gov/r/pa/ ei/bgn/ 5424.htm. The information gleaned from the Department of State's Background Note on Sudan is presented solely to place the allegations set forth in the Amended Complaint in context. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147 (2d Cir.2002) ("on a motion to dismiss, a court may consider [ . . . ] matters of which judicial notice may be taken [ . . . ].").

7. The Department of State notes that while the appearance of a joint administration was maintained, the British formulated policies and supplied most of the top administrators.

8. The civil war during this period was marked by several successive governments: a conservative coalition government, a military regime, a provisional government, a second coalition government, and a second military coup.

to a civilian government as promised. Al–Mahdi became prime minister and led a coalition government. During the next three years, the civil war intensified in lethality and the economy continued to deteriorate. In 1989, the army replaced the government with the Revolutionary Command Council for National Salvation led by General Omar Hassan al-Bashir. The military regime repudiated an earlier tentative peace agreement, and sought to restart negotiations with the southern Sudanese rebels without preconditions. These negotiations proved unsuccessful. According to plaintiffs, the post–1989 military regime has "dramatically intensified the religious and ethnic persecution of non-Muslim Sudanese by engaging in a campaign of terror, both domestically and internationally, against non-Muslims it perceives to be its enemies." Amended Complaint, at ¶ 12. The military regime also accelerated the application of *Shari'a* throughout Sudan. In 1991, the military regime enacted the Criminal Act of 1991, which instituted *Shari'a*-based penalties nationwide, including amputation and stoning. In 1993, the government transferred all non-Muslim judges from southern Sudan to the north, and replaced southern judges with Muslim judges.

### D. Current Conflict

Plaintiffs allege that the present government of Sudan is controlled by a "Taliban-style Islamic fundamentalist movement" known as the National Islamic Front. Amended Complaint, at ¶ 12. Plaintiffs contend that the government of Sudan is prosecuting a "war of genocide" against the population in the southern part of the country. Amended Complaint, at ¶ 14. This genocide, which plaintiffs also describe as a *jihad*, or holy war, is purportedly aimed at the forced Islamization of the south, and has resulted in approximately two million deaths and the displace-

ment of four million people. *See* Amended Complaint, at ¶ 14. Christians and those practicing traditional indigenous religions are subject to intense persecution, including extrajudicial killing, kidnapping, rape, enslavement, and confiscation of property. *See id.* at ¶ 1.

Sudan's attacks on civilians have been widely acknowledged and condemned. Plaintiffs note that in 1997, Sudan was classified by the United States as a state sponsor of terrorism pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, based, *inter alia*, on its record of terrorism and on the prevalence of human rights violations including slavery and restrictions on religious freedom. *See* Amended Complaint, at ¶ 13. In September 2000, Commissioner Nina Shea of the United States Commission on International Religious Freedom expressed the Commission's view that "the government of Sudan is the world's most violent abuser of the right to freedom of religion and belief." *Id.* at ¶ 50(b). In March 2001, Secretary of State Colin Powell reported that "[t]here is perhaps no greater tragedy on the face of the Earth today than the tragedy that is unfolding in the Sudan." *Id.* at ¶ 50(c).

On October 31, 2001, President Bush extended the sanctions against Sudan, declaring that "the actions and policies of the Government of Sudan continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States." Amended Complaint, at ¶ 13. Since the Amended Complaint was filed, President Bush signed the Sudan Peace Act, Pub.L. No. 107–245 (2002) ("Peace Act"). The Peace Act, which was passed unanimously in the Senate and by a vote of 359 to 8 in the House of Representatives, states that "[t]he acts of the Government of Sudan, including the acts described in this section, constitute genocide

as defined by the Convention on the Prevention and Punishment of the Crime of Genocide." Peace Act, at § 2(10). The Peace Act also condemns, *inter alia,* Sudan's overall human rights record, its role in tolerating slavery, its aerial bombardment of civilian targets. *See id.* at § 4(1). It also states that Sudan is systematically engaging in a policy of "low-intensity ethnic cleansing" to destroy the societies, culture, and economies of the Dinka, Nuer, and Nuba peoples. *See id.* at § 4(2).

### E. Oil Connection

#### 1. Overview

Plaintiffs contend that the current conflict in Sudan has evolved into an "oil war" for control of valuable petroleum resources in the south. *See* Amended Complaint, at ¶ 11. Deposits of oil were discovered in 1979 by the Chevron Oil Company. Upper Nile, Unity, and Southern Kordofan provinces appear to be especially rich in oil deposits. However, the oil deposits in these areas are of a heavy and viscous nature, requiring sophisticated Western methods for extraction and processing. *See id.* at ¶ 17. Consequently, the Sudanese government granted oil concessions to foreign oil companies. The other factor complicating oil exploration and extraction is the fact that the oil-rich areas lie in southern areas that had been outside of the government's control since 1982 by virtue of the civil war. *See id.* at ¶ 16. Indeed, Chevron's exploration and extraction efforts came to an end in 1984 after several Chevron workers were killed. *See id.* at ¶ 16. After an abortive attempt to restart operations in 1988, Chevron sold its concession to the Arakis Energy Corporation ("Arakis"), a Canadian company. *See id.* at ¶ 16. According to plaintiffs, Arakis (and later Talisman) were aware from the outset that military action would be re-

quired to secure the concession for oil exploration and extraction. *See id.* at ¶ 18.

According to plaintiffs, the Government's oil development policy and its violent campaign against ethnic and religious minorities were inextricably linked from the beginning. *See id.* at ¶ 21. Plaintiffs allege that the Government saw its oil reserves as potential sources of capital to purchase missiles, tanks, bombers, helicopters, and other sophisticated armaments needed to intensify its *"jihad"* against the southern population. The Sudanese government realized it would be unable to successfully develop its oil reserves without outside aid. Plaintiffs describe the resulting arrangement between the Government and oil companies thusly:

> In exchange for oil concessions, the Government promised to clear the area around the oil fields of the local population. The oil companies agreed to invest in the infrastructure, such as transportation, roads and airfields and communications facilities, to support exploration and the Government would use that same infrastructure to support its genocidal military campaign of ethnic cleansing against the local population. Under this unholy alliance, the oil companies would be able to maximize security around the oil installations and Sudan would get the capital necessary to wage a full scale war against the south.

Amended Complaint, at ¶ 21. Plaintiffs allege that the Government's conflict with the south serves two purposes—advancing the *jihad* against the non-Muslim south, and depopulating areas around oil concessions. *See id.* at ¶¶ 14–15.

#### 2. Talisman

Talisman Energy, Inc. is the largest independent Canadian oil producer and is headquartered in Calgary, Alberta. *See* Amended Complaint, at ¶ 3. It conducts

activities throughout the world, with operations in Canada, the United States, the North Sea, Indonesia, Algeria, Trinidad, Colombia, and Sudan. *See id.* at ¶ 3. It is a public company and its shares are traded on the Toronto and New York Stock Exchanges. *See id.* at ¶ 3. Within the United States, Talisman conducts ongoing and significant business through its wholly-owned subsidiary, Fortuna (U.S.) Inc. ("Fortuna"), and Rigel Petroleum, Inc. ("Rigel"). Fortuna is a Washington corporation; Rigel is a Utah corporation. The extent of Talisman's presence in the United States is examined in depth *infra.*

On October 28, 1998, Talisman acquired all of the assets and liabilities of Arakis, including its Sudanese operations, for approximately $220 million in stock. *See id.* at ¶ 22. Currently, Talisman operates in Sudan through a consortium of oil companies, called the Greater Nile Petroleum Operating Company Ltd. ("GNPOC"). *See id.* at ¶ 7. Talisman, through intermediate subsidiaries, owns or controls 25 % of GNPOC. *See id.* at ¶ 7. The other GNPOC constituents are the Chinese National Petroleum Company (40%); Petronas Carigali Nile Ltd. of Malaysia (30%); and Sudapet Ltd. of Sudan (5%). *See id.* at ¶ 7. In this action, Talisman is being sued for its own actions and omissions as well as in its capacity as successor-in-interest to Arakis and as a member of GNPOC. *See id.* at ¶ 3.

After GNPOC was formed, each of its constituent members took on specific areas or tasks. Talisman was in charges of exploration and production in certain areas known as Block 1, 2, and 4. *See id.* at ¶ 19. This area totals approximately 130,000 acres of land with proven oil reserves and nearly 12 million acres of land with no proven oil reserves. *See id.* at ¶ 19. Block 1, known as Unity field, is in an area northeast of the city of Bentiu. *See id.* at

¶ 19. Block 2, known as Heglig field, is east of Block 1. Block 4, known as Kaikang field, lies to the south and west of Blocks 1 and 2. *See id.* at ¶ 19. The areas covered by Blocks 1, 2, and 4 are inhabited primarily by the Dinka and Nuer peoples, who are Christian or practice traditional indigenous religions. *See id.* at ¶ 19.

### 3. Defendants' Alleged Conduct

Plaintiffs claim that Arakis had a "well-known and established relationship with the Sudanese military." Amended Complaint, at ¶ 22. In exchange for government protection, Arakis repaired Government military trucks and supplied basic utilities to nearby Government military bases. *See id.* at ¶ 22. Arakis was aware that the Government was engaged in a campaign of "ethnic cleansing" to provide a *cordon sanitaire* to facilitate the exploration and extraction of oil. *See id.* at ¶ 22.

Talisman commenced its operations in Sudan in October 1998. *See id.* at ¶ 28. Plaintiffs contend that Talisman worked with the Government to devise a plan of security for the oil fields and related facilities. *See id.* at ¶ 26. Talisman hired its own military advisors to coordinate military strategy with the Government. *See id.* at ¶ 26. Specifically, Talisman would have regular meetings with Sudan's army intelligence unit and the Ministry of Energy and Mining during which the parties would discuss "how to dispose of civilians" in areas in which Talisman intended to operate. *Id.* at ¶ 32. Based on the joint Talisman–Government strategy, "Government troops and allied militia engaged in an ethnic cleansing operation to execute, enslave or displace the non-Muslim, African Sudanese civilian population from areas that are near the pipeline or where Talisman wanted to drill." *Id.* at ¶ 26. Talisman was and is aware that Government's "protection" of oil operations en-

tailed "ethnic cleansing" or genocide, including the murder of substantial numbers of civilians (including women and children); the destruction of civilian residences and villages; and the capture and enslavement of civilians who survived the military attacks. *See id.* at ¶ 33. Defendants' concerted actions are purportedly demonstrated by, *inter alia,* a May 7, 1999 communication from the Government's Petroleum Security Office in Khartoum to a satellite office in Heglig. *See id.* at ¶ 27. This directive, denominated as "very urgent," reads as follows:

> In accordance with directives of His Excellency the Minister of Energy and Mining and fulfilling the request of the Canadian Company...the armed forces will conduct cleaning up operations in all villages from Heglig to Pariang.

*Id.* at ¶ 27. Plaintiffs claim that thousands of villages and at least seventeen churches were destroyed in the areas surrounding Talisman's oil fields, and that one, el-Toor, was located within walking distance of a Talisman site. *See id.* at ¶ 30. The same Government troops assigned to protect Talisman's oil operations participated in the armed campaign against ethnic and religious minorities in the Unity and Ruweng areas. *See id.* at ¶ 30. In the last year, Talisman has expanded operations in Block 4. This expansion was preceded by an extensive Government military campaign against at least seven Nuer villages. Talisman officials were and are aware of these military activities around its oil fields, and of the Government's tactics of targeting civilians. *See id.* at ¶ 48. At several points, the then-governor of Unity province advised Talisman officials of the violent displacement of the civilian population. *See id.* at ¶ 48.

In addition to this alleged direct support, Talisman also allegedly indirectly supported the Government's genocidal campaign. Plaintiffs note that Talisman, through GNPOC, built a network of all-weather roads. *See id.* at ¶ 35. These roads were used by Government forces to launch military offensives against civilian targets. *See id.* at ¶ 35. Similarly, Talisman expanded an existing dirt runway in Heglig to accommodate large transport planes. *See id.* at ¶ 36. This runway was later regularly used, with Talisman's knowledge, for military purposes, including bombing and strafing attacks on civilian areas. *See id.* at ¶ 36. In October 2001, the Heglig airfield was used to bomb a United Nations relief site. *See id.* at ¶ 37. Another Talisman airfield, in the Unity area is also used by the Government to attack civilian targets. *See id.* at ¶ 38. GNPOC has also provided vehicles for use by the Government in its war against ethnic and religious minorities in the south. *See id.* at ¶ 39. Plaintiffs cite two examples. First, at the end of 1998, GNPOC gave the Government fifty camouflaged transport vehicles. *See id.* at ¶ 39. Second, Talisman worked with the Government to establish a military garrison at Wangkei. *See id.* at ¶ 39.

Plaintiffs also cite statements made by non-governmental organizations, United States government officials, United Nations officials, and others attesting to the gross human rights violations committed by Sudan. These statements also allege that the oil exploration and extraction activities taking place in Sudan are fueling the war on civilians. For example, plaintiffs cite a statement by the United Nations Commission on Human Rights: "[L]ong-term efforts by the various Governments of the Sudan to protect oil production have included a policy of forcible population displacement in order to clear oil producing areas and transportation routes of southern civilians." *Id.* at ¶ 54(a). Plaintiffs allege that "Sudan has used its oil revenues to finance the cre-

ation of a domestic arms industry necessary to assist in its prosecution of military operations against non-Muslim, African Sudanese minorities in light of the international arms embargo." *Id.* at ¶ 57.

### F. Plaintiffs

Plaintiffs in this action claim to be the victims of the genocidal acts allegedly committed by Sudan and Talisman. They are pursuing this action on their own behalf and on behalf of all non-Muslim, African Sudanese residents of areas within fifty (50) miles of the GNPOC or other oil concession areas and transportation routes in Sudan. *See* Amended Complaint, at ¶ 66.

#### 1. Presbyterian Church of Sudan

The Presbyterian Church of Sudan ("Presbyterian Church") is an unincorporated association of people of the Presbyterian faith who are or were residents of Sudan. *See* Amended Complaint, at ¶ 2(a). Its parishes are located in a broad area of Upper Nile province within and adjacent to the Unity and Heglig oil concessions.[9] *See id.* at ¶ 2(a). Plaintiffs claim the Presbyterian Church's churches have been bombed and destroyed and that its church leaders and parishioners have been displaced by Government forces because of their religion and proximity to the oil fields. *See id.* at ¶ 2(a).

#### 2. Rev. John Sudan Gaduel

Rev. John Sudan Gaduel is a citizen of Sudan currently residing in Kenya and is Pastor of the Presbyterian Church of Sudan in Bentiu. *See id.* at ¶ 2(b). As a result of the alleged actions of defendants,[10] Rev. Gaduel was forced to seek refuge in Kenya for his own safety. *See id.* at ¶ 2(b). Rev. Gaduel established the South Sudan Operation Mercy in 1999, a non-denominational relief organization to coordinate emergency relief efforts for the displaced people of southern Sudan. *See id.* at ¶ 2(b).

#### 3. Nuer Community Development Services in U.S.A.

Nuer Community Development Services in U.S.A. ("NCDS") is a non-profit corporation organized under the laws of the State of Minnesota in 1999. *See id.* at ¶ 2(c). Its mission is to assist Nuer refugees in the United States and those who remain in Sudan. *See id.* at ¶ 2(c). Members of NCDS are refugees who fled areas within or adjacent to Talisman's oil concessions in southern Sudan due to defendants' "ethnic cleansing" campaign against non-Muslim Africans. *See id.* at ¶ 2(c). NCDS members are now citizens of the United States or resident aliens. NCDS has chapters and/or members in states including New York, Nebraska, and Iowa. *See id.* at ¶ 2(c). Relatives of NCDS members in Sudan have been the subject of extrajudicial killings and kidnappings and have had their property destroyed or confiscated. *See id.* at ¶ 2(c).

#### 4. Stephen Kuina

Stephen Kuina is a Sudanese citizen who lived in the village of Dibor. *See id.* at ¶ 2(d). On April 4, 2000, as part of the Government's "ethnic cleansing" campaign against non-Muslim, African Sudanese in oil producing areas, his village was attacked by helicopter gunships and infantry forces. *See id.* at ¶ 2(d). The military

---

**9.** Since 1997, Sudan has organized itself into twenty-six provinces. The Upper Nile province is located in southeastern Sudan and borders Ethiopia. The northern border of the Upper Nile state is approximately 300 kilometers south of Sudan's capital, Khartoum.

**10.** Plaintiffs do not specify the particular acts that caused Gaduel to flee Sudan.

action in Dibor led to deaths, property destruction, and the displacement of numerous villagers, including Kuina. *See id.* at 2(e).

### 5. Fatuma Nyawang Garbang

Fatuma Nyawang Garbang is a Sudanese citizen who currently resides in Illinois as a refugee. *See id.* at ¶ 2(e). Garbang is a Nuer of the Bul tribe and was born and raised in Bentiu. *See id.* at ¶ 2(e). In 1994, she and her husband were living in Ler when her village was bombed, allegedly as part of the Government's "ethnic cleansing" campaign against non-Muslim, African Sudanese in oil producing areas. *See id.* at ¶ 2(e). Garbang fled with her family and survived for twenty-one days hiding in the bush. *See id.* at ¶ 2(e). After seeking refuge in Kenya, Garbang returned to Ler and attempted to reestablish her home; however, repeated Government attacks in support of oil exploration and extraction activities made this impossible. *See id.* at ¶ 2(e).

### 6. Daniel Wour Cluol

Daniel Wour Cluol is a Sudanese citizen currently residing as a refugee in Iowa. *See id.* at ¶ 2(f). He was living in Kier in 1998 when the government attacked his village with infantry units and heavy bombers. *See id.* at ¶ 2(f). During the attack, civilians were killed and children were sold into slavery. *See id.* ¶ 2(f). Cluol fled the area, first to Ethiopia and later to the United States. *See id.* at ¶ 2(f).

### G. Prior Proceedings

Plaintiffs filed their class action complaint on November 11, 2001, and filed an amended complaint on February 25, 2002. Plaintiffs seek a declaration that defendants have violated international law; an injunction restraining defendants from continuing to cooperate in committing "ethnic cleansing" against non-Muslim, African Sudanese; compensatory damages from both defendants; punitive damages from Talisman; and attorneys' fees. Talisman moves to dismiss this action on the basis of lack of subject matter jurisdiction, lack of personal jurisdiction, lack of standing (of plaintiffs), *forum non conveniens*, international comity, act of state doctrine, political question doctrine, failure to join necessary and indispensable parties, and on the grounds that equity does not require a useless act.

### III. Legal Analysis

#### A. Nature of the Alleged Violations of International Law

#### 1. History of the Alien Tort Claims Act

The primary basis for asserting the Court's jurisdiction is 28 U.S.C. § 1350, otherwise known as the Alien Tort Claims Act ("ATCA").[11] The ATCA itself is succinct and simple on its face:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350.[12] Notwithstanding its brevity, however, the ATCA has dramati-

---

11. Plaintiffs also claim jurisdiction against Sudan pursuant to 28 U.S.C. § 1330 and against both defendants pursuant to 28 U.S.C. § 1331. These purported bases for jurisdiction are examined below.

12. The term "law of nations" is synonymous with international law. In this context, it refers to customary international law (as opposed to codified international law which is found in treaties).

cally altered the legal landscape. The statute was passed by the first Congress as part of the Judiciary Act of 1789.[13] *See* Lawrence W. Newman & David Zaslowsky, *The Alien Tort Claims Act: How Far Will it Go?*, N.Y.L.J., Jan. 2, 2003, at 3. Despite the fact that the ATCA has existed for over two hundred years, little is known of the framers' intentions in adopting it—the legislative history of the Judiciary Act does not refer to section 1350. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 105 n. 10 (2d Cir.2000). Judge Friendly proclaimed that "[t]his old and little used section is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act [ . . . ], no one seems to know whence it came." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975).

As Judge Friendly noted, the ATCA was only invoked a handful of times for nearly two hundred years. That changed with the landmark case of *Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980). In that case, two Paraguayan citizens living in the United States brought an action for wrongful death against a Paraguayan police official who had allegedly tortured and killed the son and brother of the plaintiffs. The Second Circuit reversed the district court's dismissal for lack of subject matter jurisdiction and held that the ACTA provided a means of redress for violations of international law, such as the right to be free from torture. In this sense, the *Filartiga* court held that the ATCA does not grant new rights to aliens, but simply operated to open the federal courts "for adjudication of the rights already recognized by international law." *Id.* at 887. The Second Circuit's interpretation of the

ACTA was intended to be a "small but important step in the fulfillment of the ageless dream to free all people from brutal violence." *Id.* at 890.

■ *Filartiga* proved to be a watershed opinion, catapulting a largely overlooked statute into the limelight as a means of vindicating rights under international law. Later decisions by both the Second Circuit and other courts have upheld and expanded the reasoning of the *Filartiga* court. *See, e.g., Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir.2000). An important aspect of this case is the nature of the alleged violations of international law. In order to be actionable under the Alien Tort Claims Act, a defendant's conduct must violate "well-established, universally recognized norms of international law." *Kadic v. Karadzic*, 70 F.3d 232, 239 (2d Cir.1995) (quoting *Filartiga v. Pena–Irala*, 630 F.2d 876, 888 (2d Cir.1980)). Courts must "interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." *See Kadic*, 70 F.3d at 238 (quoting *Filartiga*, 630 F.2d at 881). This in turn requires an examination of what international law is.

## 2. Sources of International Law

Perhaps the most widely-quoted enunciation of the sources of international law is found in the Statute of the International Court of Justice ("ICJ"). According to the Statute, the sources are as follows:

a. international conventions, whether general or particular, establishing rules

---

**13.** The original statute read: "[The district courts] shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." *See* Courtney Shaw, *Uncertain Justice: Liability of Multinationals Under the Alien Tort Claims Act*, 54 Stan. L. Rev. 1359, 1364 (2002).

expressly recognized by the contesting states;

b. international custom, as evidence of a general practice accepted as law;

c. the general principles of law recognized by civilized nations;

d. subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.

ICJ Stat. art. 38(1).[14] The Second Circuit has cited Article 38(1) as an authoritative reflection of the sources of international law. *See Filartiga v. Pena–Irala*, 630 F.2d 876, 881 n. 8 (2d Cir.1980). The Supreme Court's articulation of the sources of international law is similar. *See, e.g., The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820).

However, unlike the International Court of Justice, which does not operate on the basis of *stare decisis*[15] or the Supreme Court, which can choose whether or not to follow its own precedent, this Court, as an inferior court, is obligated to accept the law as it has been interpreted by the Supreme Court and Second Circuit. This is no less true with respect to questions of international law than any other question of law. Therefore, in addition to the sources of international law listed above, another must be added—interpretations of international law of superior courts. *See, e.g., United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820), *quoted in Filartiga v. Pena–Irala*, 630 F.2d 876, 880 (2d Cir.1980) (the law of nations may be ascertained by consulting,

*inter alia*, "judicial decisions recognising and enforcing [international law]"); *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 163, 40 L.Ed. 95 (1895) (in the absence of written international law, "the courts must obtain such aid as they can from [ . . . ] judicial decisions."). Consequently, in this Court, the decisions of the Supreme Court and Second Circuit reflect the state of international law in addition to the traditional sources listed in the Statute of the International Court of Justice.

### 3. *Jus Cogens* Violations of International Law

The allegations in the Amended Complaint include charges of genocide, war crimes, torture, and enslavement.[16] *See* Amended Complaint at ¶¶ 1, 14, 15, 21, 23, 26, 30–33, 35–48, 58, 60–62. It is not disputed that such acts violate universally-recognized norms of international law (though Talisman contends that corporations are not legally capable of violating international law). States practicing, encouraging, or condoning genocide, slavery or the slave trade, extrajudicial killings, torture, or systematic racial discrimination violate international law. *See, e.g.,* Restatement (Third) of Foreign Relations § 702 (1987). Individuals committing such acts may also be liable under international law. *See, e.g., Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995) (holding that individuals may violate international law by committing acts of genocide, war crimes, or torture).

These types of acts alleged in the Amended Complaint are qualitatively different from other types of violations of international law. The Amended Com-

---

**14.** The term "publicists" in ICJ Stat. art. 38(1)(d) refers to legal scholars.

**15.** *See* ICJ Stat., art. 59 ("The decision of the Court has no binding force except between

the parties and in respect of that particular case.").

**16.** As noted *infra*, rape may be a form of torture.

plaint is rife with accusations which, if proven true, would constitute behavior manifestly in violation of the most basic rules of international law and, indeed, of civilized conduct. Such acts violate peremptory norms, or *jus cogens*. *See* RE-STATEMENT (THIRD) OF FOREIGN RELATIONS § 702 cmt. n (1987) (stating that acts of genocide, slavery, and extrajudicial killing violate *jus cogens* norms); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir.1992); *Tachiona v. Mugabe*, 234 F.Supp.2d 401, 415–16 (S.D.N.Y. 2002). *See also* Declaration of James Crawford, S.C., at ¶ 37 ("The prohibitions against genocide, torture and slavery are peremptory norms of general international law [ . . .].").

■ Violations of *jus cogens* norms constitute violations of obligations owed to all ("*erga omnes*"). *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 702 cmt. o (1987). *See also id.* at § 404:

A state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism even where [no other basis of jurisdiction] is present.

In other words, states may exercise universal jurisdiction over acts committed in violation of *jus cogens* norms.[17] This universal jurisdiction extends not merely to criminal liability but may also extend to civil liability. *See id.* at § 404 cmt. b. In addition to triggering the potentially universal exercise of jurisdiction, *jus cogens* violations may entail not only state but individual responsibility. For example, it is well-established in the post-World War II world that individuals may be held liable for acts of genocide, war crimes, or torture. *See, e.g., Kadic v. Karadzic*, 70 F.3d 232, 241–42 (2d Cir.1995).

■ The significance of this discussion is to emphasize that *jus cogens* violations of international law such as are alleged here are fundamentally different in character than other types of international law violations.[18] The fact that they are treated differently under international law (by permitting states to exercise universal jurisdiction over these crimes, and by entailing individual responsibility) reflects the fact that these acts are offenses of universal concern by virtue of the "depths of depravity the conduct encompasses, the often countless toll of human suffering the misdeeds inflict upon their victims, and the consequential disruption of the domestic and international order they produce." *Tachiona v. Mugabe*, 234 F.Supp.2d 401, 415–16 (S.D.N.Y.2002).

## B. The Court Has Subject Matter Jurisdiction Under the ATCA

Talisman moves pursuant to FED. R. CIV. P. 12(b)(1) to dismiss for lack of subject matter jurisdiction. It is not disputed that in considering a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1), a court must assume as true factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See, e.g., Merritt v. Shuttle*, 245 F.3d 182, 186 (2d Cir.2001). Plaintiffs claim jurisdiction in this case pursuant to 28 U.S.C. §§ 1330

---

**17.** For an extended discussion of *jus cogens* violations, *see Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714–19 (9th Cir. 1992).

**18.** Of course, while *jus cogens* violations are actionable under the ATCA, a *jus cogens* violation is not required. Under the ATCA, any violation of a specific, universal, and obligatory international norm is actionable, whether it is *jus cogens* or not.

(actions against foreign states), 1331 (federal question), and 1350 (alien's action for tort). The instant motion to dismiss is made by Talisman only. Therefore, 28 U.S.C. § 1330, which is exclusively concerned with suits against foreign states, is not relevant to the instant discussion. The question is whether the Court has subject matter jurisdiction under the other two purported bases—28 U.S.C. §§ 1331 and 1350. The parties devote several pages of their briefs addressing the question of whether the Court has subject matter jurisdiction under 28 U.S.C. § 1350. In contrast, both parties relegate their discussion about jurisdiction under 28 U.S.C. § 1331 to a footnote. Consequently, the Court first addresses the central subject matter jurisdiction dispute—namely, whether jurisdiction lies under 28 U.S.C. § 1350.

### 1. Level of Review

Talisman contends that the Court must engage in a searching review of plaintiffs' allegations, at least for purposes of determining whether the Court has subject matter jurisdiction over this action. For support, Talisman turns to the Second Circuit's *Kadic* decision:

> Because the Alien Tort Claims Act requires that plaintiffs plead a "violation of the law of nations" at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible "arising under" formula of section 1331. [ . . . ]. Thus, it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations. There is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States).

*Kadic*, 70 F.3d at 238 (citation omitted). Talisman claims that this language re-

quires a Court to subject a complaint to elevated scrutiny with respect to whether or not plaintiffs allege that defendants have violated the law of nations. Talisman also claims that the Alien Tort Claims Act is similar to the Racketeer Influenced and Corrupt Organizations Act ("RICO") inasmuch as both statutes provide a civil remedy for underlying criminal acts. Talisman concludes that the elevated pleading requirements of RICO should apply to ATCA claims.

Talisman's conclusion that a court must conduct a searching review of an ATCA claim is far from self-evident. While it is true that the language of the ATCA does not contain the relatively flexible term "arising under," it does not necessarily follow that a strict pleading requirement should apply. The court's holding in *Kadic* certainly does not mandate that result. Indeed, Talisman ignores the fact that the Second Circuit, on a motion for rehearing, emphasized that "the Alien Tort [Claims] Act has a broad scope [ . . . ]." *Kadic v. Karadzic*, 74 F.3d 377, 378 (2d Cir.1996).

Talisman's argument that the ATCA is similar to RICO and should therefore entail the same strict pleading requirement lacks precedential support. Pleading rules are governed by FED. R. CIV. P. 8(a), which requires merely a "short and plain statement of the grounds upon which the court's jurisdiction depends" and "a short and plain statement of the claim showing that the pleader is entitled to relief." Talisman does not suggest that an ATCA claim is subject to the strictures of FED. R. CIV. P. 9. It does argue, however, that the Court's strict RICO pleading requirements should "guide this Court in its inquiry into the sufficiency of plaintiffs' ATCA claims." Memorandum of Law in Support of Defendant Talisman Energy Inc.'s Motion to Dismiss ("Motion Brief"), at 3. However, as the Supreme Court recently noted in

the employment discrimination context, a "requirement of greater specificity for particular claims is a result that 'must be obtained by the process of amending the Federal Rules, and not by judicial interpretation.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

It is unclear whether the "more searching review" contemplated in *Kadic* survived *Swierkiewicz*. Indeed, a prominent post-*Swierkiewicz* ATCA decision did not utilize a heightened pleading standard or "more searching review." *See Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386(KMW), 2002 WL 319887, at *5 (S.D.N.Y. Feb. 28, 2002). In this case, however, the issue is moot, because the Court holds, *infra*, that it has subject matter jurisdiction over the action, whether or not a "more searching review" is utilized.

### 2. A Corporation is Capable of Violating the Law of Nations

Talisman contends that the Court lacks subject matter jurisdiction because corporations are legally incapable of violating the laws of nations. It argues that international law applies to states and in some cases to individuals, but that "the law of nations simply does not encompass principles of corporate liability." Motion Brief, at 4. Talisman relies primarily on affidavits submitted by two renowned international law scholars, James Crawford and Christopher Greenwood. Both scholars, consulting a variety of international sources, conclude that there is no basis in existing international law for the liability of corpo-

rations. Nonetheless, a considerable body of United States and international precedent indicates that corporations may be liable for violations of international law, particularly when their actions constitute *jus cogens* violations.

### a. United States Precedent

As noted *supra*, interpretations of international law of the Supreme Court and Second Circuit are binding upon this Court. Talisman fails to cite a single Supreme Court, Second Circuit, or even Southern District of New York case holding that a corporation is "legally incapable of violating the law of nations." Motion Brief, at 4. Similarly, Messrs. Crawford and Greenwood, while citing a variety of international law sources, fail to cite a single United States case upholding their position. In fact, numerous Second Circuit cases, as well as cases from courts outside the Second Circuit, make it clear that corporations can be held liable for *jus cogens* violations.

### i. Second Circuit Precedent

Neither party cites any Supreme Court decision for the proposition that corporations are or are not potentially liable under the ATCA for violations of international law, nor is the Court aware of any such decision.[19] Therefore, the Court is obligated to follow the Second Circuit's interpretation of international law. While the Supreme Court has not yet addressed the question of whether corporations may be liable for international law violations under the ATCA, the Second Circuit has.[20] In-

---

**19.** Indeed, it would appear that the Supreme Court has only analyzed the ATCA in a single case, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Nothing in that case addresses the potential liability of a corporate defendant in a claim under the ATCA, although the Court did note that the ATCA "by

its terms does not distinguish among classes of defendants." *Id.* at 438, 109 S.Ct. 683.

**20.** The analysis that follows sets forth precedent establishing that corporations may be sued for international law violations under the ATCA. The Court also notes that under Second Circuit precedent, a corporation may

deed, since *Filartiga*, the Second Circuit has led the nation in ATCA jurisprudence. Clear and consistent Second Circuit precedent demonstrates that corporations may be held liable for *jus cogens* violations of international law.

As noted *supra*, the transformation of the ATCA from an obscure statute passed by the first Congress to a widely-used tool to vindicate international law violations began with *Filartiga*. In that case, the Second Circuit reaffirmed that United States courts are, in the absence of a congressional enactment, "bound by the law of nations, which is a part of the law of the land." *Filartiga*, 630 F.2d at 887 (quoting *The Nereide*, 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1815)). After conducting an examination of international law, the court held that deliberate torture perpetrated under the color of law violated universally accepted rules of international law. Consequently, the Second Circuit reversed the district court's determination that subject matter jurisdiction did not lie in that action.

A second watershed case in the development of ATCA jurisprudence was *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995). In *Filartiga*, the alleged acts of torture that violated international law were committed by an individual who acted under color of official authority. This left open the question of whether non-governmental actors could be culpable under the ATCA. Defendant Karadzic was the president of the self-proclaimed *Republika Srpska*, the Bosnian Serb entity. In *Kadic*, Karadzic argued (inconsistently) that while he was the president of the entity, he was not an official in any government. *See Kadic*, 70 F.3d at 239. The district court held that Karadzic was not acting under color of law

because the *Republika Srpska*, even if a state, was not recognized by other states. *See Kadic*, 70 F.3d at 239 n. 2. On that basis, it dismissed the action, accepting Karadzic's contention that "acts committed by non-state actors do not violate the law of nations." *Kadic*, 70 F.3d at 239 (quoting *Doe v. Karadzic*, 866 F.Supp. 734, 739 (S.D.N.Y.1994)).

The Second Circuit reversed the district court. In its ruling, the Second Circuit flatly rejected the notion that the reach of international law was limited to states and those acting under color of state law:

> We do not agree that the law of nations, as understood in the modern era, confines its reach to state action. Instead, we hold that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals.

*Kadic*, 70 F.3d at 239. The Second Circuit noted that historically the law of nations had been applied to certain acts of individuals, such as piracy. Pirates were considered *hostis humani generis* (an enemy of mankind) in part because they acted without the pretense of state authority. *See BRIG MALEK ADHEL v. U.S.*, 43 U.S. (2 How.) 210, 232, 11 L.Ed. 239 (1844). Over time, slave traders grew to be considered enemies of mankind, subject to liability under international law. *See Kadic*, 70 F.3d at 239. In the modern era, the hijacker, war criminal and genocidaire have also come to be considered *hostis humani generis*. *See Kadic*, 70 F.3d at 240. The court concluded that "the inclusion of piracy and slave trade from an earlier era and aircraft hijacking from the modern era demonstrates that offenses of 'universal

bring an action under the ATCA. *See Amerada Hess Shipping Corp. v. Argentine Republic*, 830 F.2d 421, 425 (2d Cir.1987), *rev'd on other* grounds, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).

concern' include those capable of being committed by non-state actors." *Kadic*, 70 F.3d at 240. These crimes of "universal concern" are synonymous with *jus cogens* violations discussed *supra.*

The Second Circuit went on to analyze specific crimes. It first looked at international jurisprudence concerning genocide, including declarations of the United Nations General Assembly and the Convention on the Prevention and Punishment of the Crime of Genocide, 78 U.N.T.S. 277, *entered into force* Jan. 12, 1951, *for the United States* Feb. 23, 1989 ("Genocide Convention"). In particular, the court noted that under the Genocide Convention, "Persons committing genocide or any of the other acts enumerated in article 3 shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals." *Id.* at art. 4. The Second Circuit held that the U.N. documents and the Genocide Convention "unambiguously reflect that [...] the proscription of genocide has applied equally to state and non-state actors." *Kadic*, 70 F.3d at 232.

The *Kadic* court then turned to the question of whether war crimes could be imputed to individuals not acting under color of law. In the instant case, plaintiffs accuse defendants of violating the law of nations and customary international law "relating to [...] the treatment of civilians during armed conflicts," an apparent reference to war crimes. Plaintiffs do not address the existence of a prerequisite for the commission of most war crimes; namely, an international armed conflict. Plaintiffs do not allege, nor is there evidence to support a finding, that the conflict in Sudan constitutes an international armed conflict. Indeed, all evidence suggests that the conflict is internal. There is no suggestion that rebel forces in the south are acting as proxy forces of another country. Thus, the four Geneva Conventions would appear not to apply to the conflict in Sudan. *See* Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, *entered into force* Oct. 21, 1950, *for the United States* Feb. 2, 1956, 6 U.S.T. 3114, T.I.A.S. 3362, 75 U.N.T.S. 31 ("Geneva Convention I"); Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of Armed Forces at Sea, *entered into force* Oct. 21, 1950, *for the United States* Feb. 2, 1956, 6 U.S.T. 3217, T.I.A.S. 3363, 75 U.N.T.S. 85 ("Geneva Convention II"); Convention Relative to the Treatment of Prisoners of War, *entered into force* Oct. 21, 1950, *for the United States* Feb. 2, 1956, 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N.T.S. 135 ("Geneva Convention III"); Convention Relative to the Protection of Civilian Persons in Time of War, *entered into force* Oct. 21, 1950, *for the United States* Feb. 2, 1956, 6 U.S.T. 3516, T.I.A.S. 3365, 75 U.N.T.S. 287 ("Geneva Convention IV"). Sudan acceded to the Geneva Conventions on September 23, 1957.

However, common article 3 applies to armed conflicts which are not of an international character. Common article 3 mandates the following:

> (1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.

> To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) taking of hostages;

(c) outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for.

[ . . . ].

Geneva Convention I art. 3; Geneva Convention II art. 3; Geneva Convention III art. 3; Geneva Convention IV art. 3. The Amended Complaint sets forth sufficient facts to allege a violation of common article 3 as well as customary international law protecting non-combatants.

In *Kadic*, the Second Circuit, reviewing the Geneva Conventions, concluded that violations of common article 3 could be imputed to the acts of individuals:

The offenses alleged by the appellants, if proved, would violate the most fundamental norms of the law of war embodied in common article 3, which binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents. The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II, [ . . . ] and remains today an important aspect of international law [ . . . ].

70 F.3d at 243. On this basis, the *Kadic* court held that it had subject matter jurisdiction over claims of war crimes and the treatment of civilians during (internal) armed conflicts.

Finally, the *Kadic* court considered whether acts of torture, summary execution, and rape could lead to the liability of an individual not acting under color of law. The court, after reviewing its prior holding in *Filartiga*, the Torture Victim Protection Act of 1991, Pub.L. No. 102–256 (1992), and the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, 23 I.L.M. 1027 (1984), *as modified*, 24 I.L.M. 535 (1985), *entered into force* June 26, 1987, *ratified by United States* Oct. 21, 1994, 34 I.L.M. 590, 591 (1995), determined that an individual could be held liable for such acts if they were committed under color of law. *See Kadic*, 70 F.3d at 243–44. In addition, the court held that an individual could be held liable for such acts regardless of whether he was acting under color of law if such acts were committed in the course of genocide and/or war crimes. *See id.* at 244.

■ While *Filartiga* marked the birth of modern ATCA litigation, *Kadic* established that individuals, even those not acting under color of law, can be held liable for certain violations of the law of nations (i.e., *jus cogens* violations) whether or not they acted under color of state authority. In *Jota v. Texaco Inc.*, 157 F.3d 153 (2d Cir.1998), Ecuadorian residents brought a class action under the ATCA against a corporation, Texaco, for alleged environmental and personal injuries resulting from the corporation's exploitation of certain oil fields. The district court dismissed the suit on the basis of *forum non conveniens*, international comity, and failure to join an indispensable party. In *Jota*, the Second Circuit addressed these issues, and ultimately vacated the district court's decision and remanded the case. It did not explicitly address the question of subject matter jurisdiction, and the parties had apparently not raised the issue on appeal. However, "even when no party has ques-

tioned the court's subject matter jurisdiction, the court has the duty to dismiss *sua sponte* when such jurisdiction is lacking." *Endicott Johnson Corp. v. Liberty Mutual Ins. Co.*, 116 F.3d 53, 58 (2d Cir.1997) (citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908)). *See also Westmoreland Capital Corp. v. Findlay*, 100 F.3d 263, 266 (2d Cir.1996) (failure of parties to move to dismiss for lack of subject matter jurisdiction does not work to confer jurisdiction on a court; subject matter jurisdiction cannot be waived and may be raised *sua sponte* by the court). The fact that the Second Circuit did not address an obvious jurisdictional question *sua sponte* indicates that it had no reservations about the ATCA reaching the acts of corporations. The Second Circuit's holdings in later cases confirms this impression. Talisman's claim that in *Jota* and other cases the Second Circuit merely "assumed the possibility of liability" is not compelling, because subject matter jurisdiction, unlike other issues, represents the most fundamental question of whether a court has the legal power to hear a case, and a court has a duty to determine the issue of subject matter jurisdiction, whether or not the parties raise the issue. By reaching the merits in *Jota*, the Second Circuit tacitly acknowledged that subject matter jurisdiction lay in that case.

In *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir.2000), the Second Circuit again confronted a situation in which a corporation was sued under the ATCA. As in the instant case, the defendant was alleged to have committed violations of international human rights law. The court did not directly address the question of subject matter jurisdiction. As noted above, this fact indicates that the court

believed that subject matter jurisdiction lay in that action. Moreover, the Second Circuit reiterated its recent holding in *Kadic* that "the ATCA reaches the conduct of private parties provided that their conduct is undertaken under the color of state authority or violates a norm of international law that is recognized as extending to the conduct of private parties." *Wiwa*, 226 F.3d at 104. Both of the two defendants in *Wiwa* were private corporations. In light of that fact, *Wiwa* clearly extended the decision in *Kadic* to apply the ATCA to the acts of corporations that constitute *jus cogens* violations.

Only months after the *Wiwa* decision, the Second Circuit decided *Bigio v. Coca–Cola Co.*, 239 F.3d 440 (2d Cir.2000).[21] In that case, Canadian citizens and an Egyptian corporation sued the Coca–Cola Company and the Coca–Cola Export Company (collectively, "Coca–Cola"), both Delaware corporations. The plaintiffs in *Bigio* stated that the Egyptian government had unlawfully seized their property in Egypt because they were Jewish. Coca–Cola then allegedly purchased or leased the plaintiffs' property with full knowledge of the unlawful manner in which it was seized. Unlike in *Jota* or *Wiwa*, in *Bigio* subject matter jurisdiction was squarely before the court: "if the complaint did not plead a violation of the law of nations by Coca–Cola, the district court was without subject matter jurisdiction under the Alien Tort Claims Act, and neither it nor we may consider the matter further under the Act." *Bigio*, 239 F.3d at 447. The Second Circuit emphasized the centrality of the question of subject matter jurisdiction, stating that the "first issue we must address is whether Coca–Cola can have violated 'the law of nations' if it acted solely as a non-governmental entity." *Bigio*, 239

---

**21.** *Bigio* was originally decided on December 7, 2000 and was amended on January 2,

2001. The amended decision, 239 F.3d 440, superceded an earlier decision, 235 F.3d 63.

F.3d at 447. The Second Circuit noted that the plaintiffs only alleged that Coca–Cola had acquired property that it knew had been discriminatorily expropriated. The Second Circuit rightly pointed out that although such discriminatory expropriation was "reprehensible," it was not an act of "universal concern" or a *jus cogens* violation. *Bigio,* 239 F.3d at 448. Additionally, the Second Circuit found that the *Bigio* plaintiffs had not alleged that Coca–Cola conspired with the Egyptian government in conducting the unlawful expropriation.

The Second Circuit's reasoning in *Bigio* is instructive. Although it ultimately held that the district court lacked subject matter jurisdiction under the ATCA, it did so because it was unclear that the acts allegedly committed by Coca–Cola actually violated international law. At the very least, the court held, the acts alleged to have been committed by Coca–Cola only violated international law when committed by state actors. *See Bigio,* 239 F.3d at 448. The *Bigio* court contrasted these acts with slave trading, genocide, and war crimes, citing *Kadic* and RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 404 (1987). The clear implication is that subject matter jurisdiction would have existed if the *Bigio* plaintiffs had alleged *jus cogens* violations such as enslavement, genocide, or war crimes—exactly the acts alleged in the instant case—rather than procurement of unlawfully expropriated property.[22]

The Second Circuit recently delivered an opinion in *Aguinda v. Texaco, Inc.,* 303 F.3d 470 (2d Cir.2002) which also involved a suit against a private corporation under the ATCA for alleged violations of international law. The court ultimately affirmed the district court's dismissal of the case on the basis of *forum non conveniens.* In so doing, however, the court merely held that Ecuador was the most convenient forum for the action; it did not hold that the action could not be brought in the Southern District of New York. Indeed, in deciding the *forum non conveniens* motion, the Second Circuit painstakingly weighed the various factors militating for and against trying the action in the United States. Such analysis would have been wholly superfluous if there was no subject matter jurisdiction to try the case in federal court in the first place. Thus, the recent *Aguinda* decision adds credence to the notion that corporations may be held liable for international law violations under the ATCA.

As noted, Talisman contends that the Second Circuit has never squarely addressed the question of whether corporations are potentially liable for international law violations under the ATCA. While the Second Circuit has not explicitly held that corporations are potentially liable for violations of the law of nations, it has considered numerous cases, as noted above, where a plaintiff sued a corporation under the ATCA for alleged breaches of international law: *Jota, Wiwa, Bigio,* and *Aguinda.*[23] In each of these cases, the Second Circuit acknowledged that corporations are potentially liable for violations of the law of nations that ordinarily entail individual responsibility, including *jus cogens* violations.

### ii. Other Circuit Precedent

In addition to Second Circuit precedent, other circuit courts have held that corpora-

---

**22.** Unlike in the instant case, the *Bigio* complaint did "not allege that Coca–Cola acted together with state officials"; nor was Coca–Cola charged with "committing a violation of the law of nations with significant state aid." *Bigio,* 239 F.3d at 448.

**23.** *See also United States v. FMC Corp.,* 572 F.2d 902 (2d Cir.1978) (extending criminal liability to a corporation for violating the Migratory Bird Treaty Act).

tions may be held liable under the ATCA for certain international law violations. Earlier this year, the Ninth Circuit decided *Deutsch v. Turner Corp.*, 317 F.3d 1005 (9th Cir.2003). In that case, plaintiffs, who alleged that they had been forced to work as slave laborers during World War II, sued a myriad of German and Japanese corporations under various statutes, including the ATCA. The Ninth Circuit, while dismissing the ATCA claims on statute of limitations grounds, tacitly acknowledged subject matter jurisdiction by not addressing that issue *sua sponte*. *See Deutsch*, 317 F.3d at 1028–29.

The Ninth Circuit more explicitly recognized that a corporation could be sued under the ATCA in *Doe v. Unocal Corp.*, — F.3d —, 2002 WL 31063976 (9th Cir.2002).[24] According to the *Doe* court, "[a] threshold question in any ATCA case *against a private party* such as Unocal, is whether the alleged tort requires the private party to engage in state action for ATCA liability to attach, and if so, whether the private party in fact engaged in state action." *Doe*, — F.3d at —, 2002 WL 31063976, at *9. The court, citing *Kadic*, held that because the complaint alleged *jus cogens* violations (including rape, torture, and summary execution), no state action was necessary and Unocal could be held liable. *See Doe*, — F.3d at —, 2002 WL 31063976, at *9.

The Fifth Circuit also confronted the issue of corporate liability under the ATCA in *Beanal v. Freeport–McMoran, Inc.*, 197 F.3d 161 (5th Cir.1999). The Fifth Circuit dismissed the ATCA claims, but did so based on the fact that the alleged acts, including surveillance, mental torture, death threats, house arrest, and environmental abuse did not clearly violate the law of nations. *See id.* at 165–66. The court did not question the fact that it had jurisdiction over the subject matter of the action.[25] More than a decade earlier, the Fifth Circuit explicitly assumed without deciding that it had subject matter jurisdiction in an ATCA action against a corporation for violations of international law. *See Carmichael v. United Technologies Corp.*, 835 F.2d 109, 113–14 (5th Cir.1988).

### iii. District Court Precedent

In addition to the Second, Ninth, and Fifth Circuits, numerous district courts have examined cases in which corporations were sued under the ATCA for alleged violations of the law of nations. In these cases, the district courts either assumed or held that the court had subject matter jurisdiction over a corporation for alleged international law violations. *See e.g., Abdullahi v. Pfizer, Inc.*, No. 01 Civ. 8118, 2002 WL 31082956 (S.D.N.Y. Sept. 17, 2002) (upholding subject matter jurisdiction where a corporation allegedly acted in concert with the Nigerian government to violate international law); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) (denying a motion to dismiss for lack of subject matter jurisdiction where a corporation was alleged to have been complicit

---

**24.** By Order dated February 14, 2003, a majority of the Ninth Circuit voted to rehear the case en banc. In light of the fact that numerous courts have upheld ATCA actions against corporate defendants, there is no reason to suspect that this aspect of the vast *Doe* decision will be decided differently by the full Ninth Circuit. Even if the holding in *Doe* were to be reversed by the en banc court, overwhelming precedent (especially Second Circuit precedent) demonstrates that corporations are subject to *jus cogens* claims under the ATCA.

**25.** The Fifth Circuit explicitly reserved decision on the question of whether a corporation could be held liable under the Torture Victim Protection Act.

with a foreign state in violating international law) [26]; *Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 127–28 (E.D.N.Y.2000) (holding that subject matter jurisdiction existed under the ATCA where plaintiffs alleged a French bank had been complicit with the Nazi regime); *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 445 (D.N.J. 1999) ("No logical reason exists for allowing private individuals and corporations to escape liability for universally condemned violations of international law merely because they were not acting under color of law."); *Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1090–95 (S.D.Fla.1997) (holding that subject matter jurisdiction existed in an ATCA action against a Bolivian corporation).

**b. International Precedent** [27]

As noted *supra,* this Court is obliged to follow international law as interpreted by the Supreme Court and Second Circuit. In light of the precedent cited above, the Court must reject Talisman's claim that it is legally incapable of violating the law of nations. A further examination of international legal precedent similarly reveals that Talisman's position is "anachronistic." Declaration of Professor Ralph G. Steinhardt, at ¶ 8, appended to Declaration of Stephen A. Whinston dated June 26, 2002 as Exhibit 1. A review of international precedent and practice reveals that corporate liability, at least for *jus cogens* viola-

tions, is contemplated under international law.

**i. International Tribunal Precedent**

The concept of corporate liability for *jus cogens* violations has its roots in the trials of German war criminals after World War II. The Nuremberg Charter permitted the prosecution of "a group or organization" and allowed the tribunal to declare that entity a "criminal organization." Agreement for the Prosecution and Punishment of Major War Criminals of the European Axis, and Establishing the Charter of the International Military Tribunal, 1951, arts. 9, 10, 82 U.N.T.S. 279. In *United States v. Flick, United States v. Krauch,* and *United States v. Krupp,* the heads of major German corporations were prosecuted for, *inter alia,* war crimes and crimes against humanity. *See* Steven R. Ratner, *Corporations and Human Rights: A Theory of Legal Responsibility,* 111 YALE L.J. 443, 477–78 (2001). Talisman points out, correctly, that in each of these cases, individuals, and not corporate entities, were put on trial. However, it ignores the fact that the court consistently spoke in terms of corporate liability:

> With reference to the charges in the present indictment concerning Farben's [a German corporation] activities in Poland, Norway, Alsace–Lorraine, and France, we find that the proof establishes beyond a reasonable doubt that offenses against property as defined in

---

26. The international law violations alleged in *Wiwa* required state action. Judge Wood held that the corporate defendant could be liable for state action because of a "substantial degree of cooperative action" between them. *Id.* at *13. Although the Court in the instant action finds that plaintiffs have set forth such a substantial degree of cooperative action, there is no state action requirement here because unlike in *Wiwa,* plaintiffs here allege that the acts of summary execution and torture were committed in the course of the

commission of genocide and war crimes. *See id.* at *12.

27. This section draws on analysis contained in Steven R. Ratner, *Corporations and Human Rights: A THEORY OF LEGAL RESPONSIBILITY,* 111 Yale L.J. 443 (2001). *SEE ALSO* International Council on Human Rights Policy, Beyond Voluntarism: Human Rights and The Developing International Legal OBLIGATIONS OF COMPANIES (2002), *available at* http://www.ichrp.org/ac/excerpts/41.pdf.

Control Council Law No. 10 *were committed by Farben*, and that these offenses were connected with, and an inextricable part of the German policy for occupied countries. [ . . . ]. The *action of Farben* and its representatives, under these circumstances, cannot be differentiated from acts of plunder or pillage committed by officers, soldiers, or public officials of the German Reich. [ . . . ] Such *action on the part of Farben* constituted a violation of the Hague Regulations [on the conduct of warfare].

*United States v. Krauch, quoted in* Ratner, at 478 (emphasis added). The language of the decision makes it clear that the court considered that the corporation *qua* corporation had violated international law. The same logic guided the court in a case involving the Krupp corporation:

[T]he confiscation of the Austin plant [a tractor factory owned by the Rothschilds] [ . . . ] and its subsequent detention by the Krupp firm constitute a violation of Article 43 of the Hague Regulations [ . . . and] the Krupp firm, through defendants[, . . . ] voluntarily and without duress participated in these violations.

*United States v. Krupp, quoted in* Ratner, at 478 n. 134. As in *Krauch*, the *Krupp* court makes it clear that while individuals were nominally on trial, the Krupp company itself, acting through its employees, violated international law.

The Nuremberg precedent cited above is particularly significant not merely because it constitutes a basis for finding corporate liability for violations of international law, but because the language ascribes to the corporations involved the necessary *mens rea* for the commission of war crimes and crimes against humanity; the types of criminal behavior at issue in the instant case.[28]

### ii. International Treaty Precedent

As a preliminary note, several of the major conventions protecting basic human rights, such as the Genocide Convention and common article 3 of the Geneva Convention, do not explicitly reach corporations. Nonetheless, such instruments may reach conduct by corporations:

These regimes do not distinguish between natural and juridical individuals, and it is implausible that international law would protect a corporation that engaged in the slave trade or produced the contemporary equivalent of Zyklon B for the destruction of Jews in concentration camps.

Declaration of Professor Ralph G. Steinhardt, at ¶ 14, appended to Declaration of Stephen A. Whinston dated June 26, 2002 as Exhibit 1. Thus, corporations may be liable under codified international law.[29] As

---

**28.** Talisman's experts claim that a corporation cannot have the specific intent to commit genocide. *See, e.g.,* Declaration of James Crawford, S.C., at ¶ 11(a). It is well-established, however, that corporations may be criminally liable for offenses requiring a specific intent. "We think that a corporation may be liable criminally for certain offenses of which a specific intent may be a necessary element. There is no more difficulty in imputing to a corporation a specific intent in criminal proceedings than in civil." *New York Cent. & Hudson River R.R. Co. v. United States,* 212 U.S. 481, 493, 29 S.Ct. 304, 53 L.Ed. 613 (1909) (citation omitted). Corpora-

tions may be held criminally liable under a myriad of statutes. *See, e.g.,* 18 U.S.C. §§ 1961 *et seq.* (Racketeer Influenced and Corrupt Organizations Act); 18 U.S.C. § 610 (coercion of political activity); 18 U.S.C. § 1512 (witness tampering).

**29.** Plaintiffs in this case allege violations of "the law of nations and customary international law [ . . . ]." Amended Complaint, at ¶ 75. Thus, even if corporations are not liable under extant codified international law, they may be liable under customary international law.

noted below, a variety of international treaties hold corporations directly responsible for tort violations.

Treaties, by definition, are concluded between states. *See* BLACK'S LAW DICTIONARY 1507 (7th ed.1999). Nonetheless, international treaties occasionally hold corporate defendants, as opposed to states, liable for certain acts. For instance, a major International Labour Organization convention ratified by more than 150 nations proclaims that "[w]orkers shall enjoy adequate protection against acts of anti-union discrimination in respect of their employment." Convention Concerning the Application of the Principles of the Right to Organise and To Bargain Collectively, July 1, 1949, art. I(1), *available at* http://ilo-lex.ilo.ch:1567/cgi-lex/convde.pl?C098. Such language clearly "presupposes [. . .] a duty on the corporation not to interfere with the ability of employees to form unions." Ratner, *supra* note 27, at 478–79.

Numerous treaties impose liability directly upon corporations. For example, the 1960 Paris Convention on Third Party Liability in the Field of Nuclear Energy states that "[t]he operator of a nuclear installation shall be liable" for, *inter alia*, "damage to or loss of life of any person" and damage to property. Convention on Third Party Liability in the Field of Nuclear Energy of 29th July 1960, as amended by the Additional Protocol of 28th January 1964 and by the Protocol of 16th November 1982, July 29, 1960, art. 3(a), 956 U.N.T.S. 251. Similarly, the International Convention on Civil Liability for Oil Pollution Damage holds that "the owner of a ship at the time of an incident [. . .] shall be liable for any pollution damage caused by oil which has escaped or been discharged from the ship as a result of the incident." International Convention on Civil Liability for Oil Pollution Damage, Nov. 29, 1969, art. 3(1), 26 U.S.T. 765, 973

U.N.T.S. 3. The 1963 Vienna Convention on Civil Liability for Nuclear Damage states that "[t]he operator of a nuclear installation shall be liable for nuclear damage upon proof that such damage has been caused by a nuclear incident." Vienna Convention on Civil Liability for Nuclear Damage, May 21, 1963, art. 2(1), 1063 U.N.T.S. 265. An "operator" includes "any private or public body whether corporate or not." *See id.* at art. 1(a) and (c). Several other treaties similarly impose liability not upon states but upon private, often corporate actors. *See, e.g.*, Brussels Convention Relating to Civil Liability in the Field of Maritime Carriage of Nuclear Material, Dec. 17, 1971, 974 U.N.T.S. 255; Convention on Civil Liability for Oil Pollution Damage Resulting from Exploration for and Exploitation of Seabed Mineral Resources, Dec. 17, 1976, *reprinted at* 16 I.L.M. 1450.

Significantly, all of these treaties impose corporate liability for actions or omissions by companies that have major deleterious effects such as nuclear accidents and oil spills. While most treaties do not bind corporations, the line of instruments cited above indicates that precedent does exist for holding corporations liable for large-scale torts. If corporations can be held liable for unintentional torts such as oil spills or nuclear accidents, logic would suggest that they can be held liable for intentional torts such as complicity in genocide, slave trading, or torture.

### iii. International Organization Precedent

The practice of several international organizations indicates that corporations are potentially subjects of international law. The United Nations Universal Declaration of Human Rights enumerates a series of rights, the most basic of which have become part of customary international law

(such as the prohibition on slavery and torture). By its terms, it is binding on states as well as corporations:

> The General Assembly proclaims this Universal Declaration of Human Rights as a common standard of achievement for all peoples and all nations, to the end that every individual and every organ of society, keeping this Declaration constantly in mind, shall strive by teaching and education to promote respect for these rights and freedoms and by progressive measures, national and international, to secure their universal and effective recognition and observance [ . . . ].

G.A. Res. 217 A(III), Dec. 10, 1948 ("Universal Declaration of Human Rights"). Noted legal scholar and Chief Reporter for the RESTATEMENT (THIRD) OF FOREIGN RELATIONS has stated that "[e]very individual includes juridical persons. Every individual and every organ of society excludes no one, no company, no market, no cyberspace. The Universal Declaration applies to them all." Louis Henkin, *The Universal Declaration at 50 and the Challenge of Global Markets,* 25 BROOK. J. INT'L L. 17, 25 (1999). Consequently, corporations are obligated to respect basic human rights of individuals, such as the right to life, the right to freedom from slavery, and the right to be free from torture and cruel and inhuman treatment.

Other United Nations precedent indicates that corporations have duties under international law. For example, the United Nations Security Council has frequently utilized economic sanctions to punish the unlawful acts of states. While such sanctions are formally directed at states, they also entail certain duties for corporations. For example, corporations wishing to purchase oil from Iraq following the implementation of sanctions were required by the Security Council to follow certain procedures. *See, e.g.,* S.C. Res. 986, U.N. SCOR, U.N. Doc. S/RES/986 (1995); Letter dated 26 July 2001 from the Chairman of the Security Council Committee Established by Resolution 661 (1990) Concerning the Situation Between Iraq and Kuwait Addressed to the President of the Security Council, U.N. Doc. S/2001/738. Similarly, the General Assembly passed a resolution deploring "the continued cooperation by certain States and foreign economic interests with South Africa in the military, economic, political and other fields, as such cooperation encourages the Government of South Africa in the pursuit of its inhuman policies." G.A. Res. 2671 F, U.N. GAOR, 25th Sess., Supp. No. 28, at 33–34, U.N. Doc. A/8028 (1970). Thus, "[w]hile it may appear that sanctions obligations are confined to U.N. member states, the reality has suggested otherwise." Ratner, *supra* note 27, at 484.

The practice of the European Union indicates that corporations may be subject to international law. Indeed, the Treaty Establishing the European Community and the binding decisions of the European Council and Commission have "created a vast body of legal obligations which apply directly to corporate entities" including, for example, a prohibition on anticompetitive behavior. Ratner, *supra* note 27, at 484. Beyond commercial regulations, precedent from the European Court of Justice has held that corporations may be held liable for human rights violations such as discrimination. *See, e.g.,* Case 36/74, *Walrave v. Association Union Cycliste Internationale,* 1974 E.C.R. 1405, 1419; Case 43/75, *Defrenne v. Société Anonyme Belge de Navigation Aérienne Sabena,* 1976 E.C.R. 455, 457–63.

c. **Conclusion**

 Historically, states, and to a lesser extent individuals, have been held liable under international law. However, as ex-

amined *supra*, substantial international and United States precedent indicates that corporations may also be held liable under international law, at least for gross human rights violations. Extensive Second Circuit precedent further indicates that actions under the ATCA against corporate defendants for such substantial violations of international law, including *jus cogens* violations, are the norm rather than the exception.

▬▬ Such a result should hardly be surprising. A private corporation is a juridical person and has no *per se* immunity under U.S. domestic or international law. *See* Jordan J. Paust, *Human Rights Responsibilities of Private Corporations*, 35 VAND. J. TRANSNAT'L L. 801, 803 (2002). As noted above, a corporation may be imputed with having the requisite specific intent to commit a criminal action. *See supra* note 28. Given that private individuals are liable for violations of international law in certain circumstances, there is no logical reason why corporations should not be held liable, at least in cases of *jus cogens* violations. Indeed, while Talisman disputes the fact that corporations are capable of violating the law of nations, it provides no logical argument supporting its claim. As noted at length *supra*, substantial U.S. and international precedent indicates that corporations may be responsible, in certain cases, for violations of international law. In this case, where plaintiffs allege *jus cogens* violations, corporate liability may follow. Consequently, the Court denies Talisman's motion to dismiss for lack of subject matter jurisdiction on this basis.

### C. The Court Need Not Decide if Federal Question Jurisdiction Exists

Both parties relegate the discussion of subject matter under 28 U.S.C. § 1331 to a footnote. *See* Motion Brief, at 2 n. 1; Plaintiffs' Memorandum of Law in Opposition to Talisman's Motion to Dismiss ("Opposition Brief"), at 3 n. 4. In *Filartiga*, the Second Circuit sidestepped the question of whether 28 U.S.C. § 1331, in addition to the ATCA, could provide a basis for jurisdiction. *See Filartiga v. Pena–Irala*, 630 F.2d 876, 887 n. 22 (2d Cir.1980). Fifteen years later, the Second Circuit, having found that subject matter jurisdiction existed under the ATCA, declined to answer the question of whether jurisdiction also existed under 28 U.S.C. § 1331: "we need not rule definitively on whether any causes of action not specifically authorized by statute [i.e., the ATCA] may be implied by international law standards as incorporated into United States law and grounded on section 1331 jurisdiction." *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir.1995). Like the Second Circuit in *Filartiga* and *Kadic*, this Court has held that subject matter jurisdiction exists in this case under the ATCA. The Court need not, therefore, determine whether 28 U.S.C. § 1331 would provide an alternative basis for finding subject matter jurisdiction.

### D. Plaintiffs Allege a Violation of the Law of Nations Against Talisman

Talisman contends that even if a corporation can be held liable for a violation of the law of nations, plaintiffs have failed adequately to allege such a violation against Talisman. Talisman states that this argument is made pursuant to FED. R. CIV. P. 12(b)(1). The arguments also fall under the rubric of FED. R. CIV. P. 12(b)(6). In either case, the Court must accept the allegations of plaintiffs as true. *See, e.g., Merritt v. Shuttle*, 245 F.3d 182, 186 (2d Cir.2001) (on a motion pursuant to FED. R. CIV. P. 12(b)(1), the court must accept as true allegations in the complaint); *Taylor*

*v. Vermont Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir.2002) (on a motion pursuant to FED. R. CIV. P. 12(b)(6), a court must accept as true factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor); *York v. Assoc. of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir.2002) (same); *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998) (same).

### 1. Conspiracy and Aiding and Abetting

#### a. Conspiracy and Aiding and Abetting are Actionable Under the ATCA

Talisman claims that aiding and abetting and conspiracy allegations are not actionable theories of civil liability under the ATCA. Specifically, it argues, citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that aiding and abetting theory does not provide a basis for civil liability absent an express congressional directive. Similarly, Talisman cites *Dinsmore v. Squardron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 841 (2d Cir.1998), which purportedly extended *Central Bank*'s reasoning to civil conspiracy claims. Talisman concludes that because there is no explicit congressional directive applying aiding and abetting or conspiracy theory to the ATCA, such theories are not actionable.

Talisman's contention is incorrect. Its analysis misapprehends the fundamental nature of the ATCA. The ATCA provides a cause of action in tort for breaches of international law. In order to determine whether a cause of action exists under the ATCA, courts must look to international law. *See Filartiga v. Pena–Irala*, 630 F.2d 876, 889 (2d Cir.1980); *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1995).

Thus, whether or not aiding and abetting and complicity are recognized with respect to charges of genocide, enslavement, war crimes, and the like is a question that must be answered by consulting international law. *See generally Bigio v. Coca–Cola Co.*, 239 F.3d 440 (2d Cir.2000); *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995); *Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980). *See also Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002). Talisman itself appears to concede this point. Earlier in its brief, Talisman urges the Court to dismiss the action for lack of jurisdiction because, it claims, corporations are not legally capable of violating international law. In arguing this point, Talisman states that "Courts must look to *public international law* to determine whether the plaintiffs have alleged a violation of the law of nations." Motion Brief, at 3 (emphasis added). In other words, Talisman has already conceded that the Court must look to international law to determine whether a corporation can commit genocide or war crimes. Similarly, the Court must look to international law to determine whether a corporation can conspire to commit, or aid and abet the commission of, genocide or war crimes.

While many courts have addressed situations in which corporations were alleged to have conspired with or aided and abetted states, Talisman is unable to cite a single decision in which a court held that the ATCA does not recognize an action for aiding and abetting or conspiracy. In *Kadic v. Karadzic*, 70 F.3d 232, 244–45 (2d Cir.1995), the Second Circuit made clear that the ATCA contemplated liability for private defendants who have "acted in concert" with a state to commit torture and other gross human rights violations. In *Bigio v. Coca–Cola Co.*, 239 F.3d 440 (2d Cir.2000), the Second Circuit addressed a

case in which plaintiffs sought to expand claims made in the complaint to allege that Coca–Cola was a co-conspirator in the actions of the Egyptian government. The Second Circuit rejected the claim because the plaintiffs in that case failed to articulate a causal chain between the actions of Egypt and those of Coca–Cola. However, the court did not hold that the ATCA prohibited such conspiracy-based claims. Similarly, Judge Wood refused to dismiss a claim under the ATCA that alleged that a private corporation had "directed and aided the Nigerian government in violating plaintiffs' rights." *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *1 (S.D.N.Y. Feb. 28, 2002). The district court in *Kodak v. Kavlin*, 978 F.Supp. 1078, 1091 (S.D.Fla.1997), drawing heavily on Second Circuit precedent, held that "it would be a strange tort system that imposed liability on state actors but not on those who conspired with them to perpetrate illegal acts through the coercive use of state power."

The precedent cited by Talisman is therefore unconvincing. Both cases cited by Talisman, *Central Bank* and *Dinsmore*, analyzed whether domestic securities law provides a civil cause of action for aiding and abetting or conspiracy. However, as noted *supra*, an examination of the particular jurisprudence of the Alien Tort Claims Act reveals that courts, including the Second Circuit, have almost unanimously permitted actions premised on a theory of aiding and abetting and conspiracy. This line of cases, and not the more general analysis provided by Talisman, rules the day under the maxim of *lex specialis derogat lex generalis*. U.S. courts have consistently permitted ATCA suits to proceed based on theories of conspiracy and aiding and abetting. As noted *supra*, courts must look to international law to determine the relevant substantive law. An examination of international law

reveals that the concepts of conspiracy and aiding and abetting are commonplace with respect to the types of allegations contained in the Amended Complaint, such as genocide and war crimes.

### b. Conspiracy and Aiding and Abetting Exist in International Law

After arguing that the ATCA does not contemplate actions based on claims of conspiracy and aiding and abetting, Talisman states that international law does not provide a legal basis for aiding and abetting or conspiracy claims in this case. *See* Motion Brief, at 9. Although Talisman acknowledges that "international law recognizes theories of complicit liability," it argues that plaintiffs fail to allege that Talisman provided assistance to Sudan with the intention of facilitating a violation of the law of nations. As a preliminary matter, under FED. R. CIV. P. 9(b), intent, malice, and other states of mind may be "averred generally." Moreover, even a cursory review of the Amended Complaint reveals otherwise. For example, the Amended Complaint states that Talisman and Sudan worked together to devise a security plan for the oil concession areas, and that based "upon their joint strategy, Government troops and allied militia engaged in an ethnic cleansing operation to execute, enslave or displace the non-Muslim, African Sudanese population [. . .]." Amended Complaint, at ¶ 26. Elsewhere, the Amended Complaint states that Talisman would "map out areas intended for exploration and [Talisman and Sudan] would discuss how to dispose of civilians in those areas." *Id.* at ¶ 32. These and other paragraphs set forth plaintiffs' case that Talisman deliberately worked with Sudan to plan certain unlawful acts. Plaintiffs therefore do allege that Talisman intended to facilitate a violation of the law of nations. Talisman also argues

that its acts in maintaining roads and extending landing strips are too distant causally from the alleged injuries inflicted by Sudan to be imputed to Talisman. *See* Motion Brief, at 9–10. However, the Amended Complaint does not merely state that Talisman maintained roads and extended landing strips, but instead alleges, for example, that "[Sudan] has used the Heglig field, with Talisman's knowledge, on a regular basis for military purposes, including bombing and strafing attacks on civilians [ . . . ]." Amended Complaint, at ¶ 37. Talisman cites no authority other than the declarations of its international law experts for the contention that such acts cannot entail liability.

Indeed, the concept of complicit liability for conspiracy or aiding and abetting is well-developed in international law, especially in the specific context of genocide, war crimes, and the like. The Statute of the International Military Tribunal, the body that tried Nazi war criminals, stated that "[l]eaders, organizers, instigators and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such a plan." Agreement for the Prosecution and Punishment of Major War Criminals of the European Axis, and Establishing the Charter of the International Military Tribunal, art. 6, 82 U.N.T.S. 279. Allied Control Council Law No. 10, used to prosecute German war criminals domestically, created criminal liability not only for principals who committed acts of genocide or war crimes but also for those who were connected with any plans or enterprises involving the commission of such crimes. *See* William A. Schabas, *Enforcing International Humanitarian Law: Catching the Accomplices*, 83 Int'l Rev. Red Cross 439, 442 (June 2001). Such complicity could include corporate liability.

Talisman cites the *von Weizsacker* case, in which a banker was acquitted of crimes against humanity for making loans that were used by an enterprise which exploited slave labor. However, unlike the facts in that case, here plaintiffs allege that Talisman worked directly with the government in its policy of "ethnic cleansing" and provided material aid to its efforts. In such cases, liability may follow. For example, the supplier of Zyklon B, the poison used for mass execution in many German concentration camps, was condemned by a British military court for violations of "the laws and usages of war." *United Kingdom v. Tesch*, 1 L. Rep. Tr. War.Crim. 93 (1947).

The Statute of the International Criminal Tribunal for the former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR") similarly establish criminal liability for those who have "planned, instigated, ordered, committed, or otherwise aided and abetted in the planning, preparation or execution of a crime." ICTY STAT. art. 7(1); ICTR STAT. art. 6(1). The Statute for the new International Criminal Court ("ICC") similarly recognizes complicit liability:

In accordance with this Statute, a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court if that person:

(a) Commits such a crime, whether as an individual, jointly with another or through another person, regardless of whether that other person is criminally responsible;

(b) Orders, solicits or induces the commission of such a crime which in fact occurs or is attempted;

(c) For the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or

its attempted commission, including providing the means for its commission; (d) In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:

(i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Court; or

(ii) Be made in the knowledge of the intention of the group to commit the crime;

(e) In respect of the crime of genocide, directly and publicly incites others to commit genocide;

(f) Attempts to commit such a crime by taking action that commences its execution by means of a substantial step, but the crime does not occur because of circumstances independent of the person's intentions. However, a person who abandons the effort to commit the crime or otherwise prevents the completion of the crime shall not be liable for punishment under this Statute for the attempt to commit that crime if that person completely and voluntarily gave up the criminal purpose.

ICC STAT. art. 25(3). Major human rights instruments, including the Genocide Convention and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("Torture Convention"), recognize complicity. *See, e.g.,* Schabas, at 442. *Cf. Prosecutor v. Tadic*

(Case No. IT–94–1–T), Opinion and Judgment, May 7, 1997, at ¶¶ 662–69.[30]

 Talisman claims that under international law, an actor may be liable under a theory of complicit liability if the actor intended to facilitate the violation and if the aid or assistance "significantly contributed to [the] commission of the actual violation." Motion Brief, at 9. As noted *supra,* intent need be only averred generally, *see* FED. R. CIV. P. 9(b), and, in any event, plaintiffs do make such allegations. With regard to the level of aid, international law, as reflected in the judgments of the International Criminal Tribunal for the former Yugoslavia, appears to have settled on a requirement that assistance be "direct and substantial." *Prosecutor v. Tadic* (Case No. IT–94–1–T), Opinion and Judgment, May 7, 1997, at ¶¶ 691–92. *See also Prosecutor v. Delalic* (Case No. IT–96–21–T), Judgment, Nov. 16, 1998, at ¶ 326; *Prosecutor v. Furundzija* (Case No. IT–95–17/1–T), Judgment, Dec. 10, 1998, ¶¶ 223, 245; *Prosecutor v. Aleksovski* (Case No. IT–95–14/1–T), Judgment, June 25, 1999, at ¶ 61. Similarly, "the *actus reus* of aiding and abetting in international criminal law requires practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime." *Prosecutor v. Furundzija* (Case No. IT–95–17/1–T), Judgment, Dec. 10, 1998, at ¶ 235. The ICTR has similarly held that the *actus reus* of aiding and abetting is constituted by "all acts of assistance in the form of either physical or moral support" that "substantially contribute to the commission of the crime." *Prosecutor v. Musema,* (Case No. ICTR–96–13–T), Judgment, Jan. 27, 2000, at

**30.** The jurisprudence of the ICTY and the ICTR is increasingly being consulted by courts to determine standards of international human rights law under the ATCA. *See Wiwa v. Royal Dutch Petroleum Co.,* No. 96 Civ.

8386, 2002 WL 319887, at *9–10 (S.D.N.Y. Feb. 28, 2002); *Cabello Barrueto v. Fernandez Larios,* 205 F.Supp.2d 1325, 1333 (S.D.Fla. 2002); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322 (N.D.Ga.2002).

¶ 126. While the assistance must be substantial, it "need not constitute an indispensable element, that is, a *conditio sine qua non* for the acts of the principal." *Prosecutor v. Furundzija* (Case No. IT–95–17/1–T), Judgment, Dec. 10, 1998, at ¶ 209.

The ICTY added that participation in a crime is substantial if "the criminal act most probably would not have occurred in the same way had not someone acted in the role that the accused in fact assumed." *Prosecutor v. Tadic* (Case No. IT–94–1–T), Opinion and Judgment, May 7, 1997, at ¶ 688. Tellingly, the ICTY added that providing certain means to carry out crimes constitutes substantial assistance, even if the crimes could have been carried out some other way: "For example, if there had been no poison gas or gas chambers in the *Zyklon B* cases, mass exterminations would not have been carried out in the same manner." *Id.* at ¶ 688. That being said, some knowledge that the assistance will facilitate the crime is necessary. Thus, for example, a United States war crimes tribunal acquitted several businessmen who ran the German company I.G. Farben, accepting that they honestly believed that the Zyklon B would be used as a delousing agent. *See United States v. Krauch,* 8 Tr. War Crim. 1169 (1948). Such knowledge may be actual or constructive. The United States Military Tribunal found, for example, that every person, whether a government or military employee or civilian, who was employed in, present in, or residing in the Mauthausen concentration camp, had knowledge of the criminal activities occurring in the camp without requiring a showing of actual knowledge. *Cf. Prosecutor v. Tadic* (Case No. IT–94–1–T), Opinion and Judgment, May 7, 1997, at ¶ 677.

■ The Amended Complaint properly alleges that Talisman aided and abetted or conspired with Sudan to commit various violations of the law of nations. As noted *supra,* the Amended Complaint includes allegations that Talisman worked with Sudan to carry out acts of "ethnic cleansing"; that Talisman encouraged Sudan to do so; and that Talisman provided material support to Sudan, knowing that such support would be used in carrying out such unlawful acts. Moreover, the allegations set forth that Talisman's acts were substantial as that term is understood in international law. At this stage, at least, where the Court must accept the allegations in the Amended Complaint as true, the Court has no basis to dismiss the action.

## 2. Claims by Named Plaintiffs

Talisman claims that the named plaintiffs only suffered displacement and, in the case of the Presbyterian Church, property loss. Talisman contends that "it is not a violation of the law of nations for a state to confiscate and convert the property of its own citizens without just compensation." Motion Brief, at 6. It also argues that plaintiffs never allege with particularity "what action Talisman Energy took to assist [Sudan] in the attacks that allegedly caused the plaintiffs to leave their villages." *Id.* at 6–7.

■ Talisman's argument with respect to international law is accurate: generally speaking, confiscation of property without just compensation does not violate the law of nations. However, Talisman neglects to mention that the allegations of displacement and property loss mentioned in the Amended Complaint occurred during the alleged commission of genocide, war crimes, and crimes against humanity. For example, while the Amended Complaint notes that the Presbyterian Church suffered property loss, it also states that "[i]ts churches have been bombed and destroyed and church leaders and parishio-

ners have been killed, enslaved and displaced by Government forces because of their ethnic background or religion and their location in proximity to the oil fields." Amended Complaint, at ¶ 2(a). Only the most myopic reading of the Amended Complaint could conclude that the Presbyterian Church is solely alleging property loss. Talisman's narrow reading of the Amended Complaint is even more apparent when one considers the precedent it cites. Talisman quotes *Cohen v. Hartman*, 634 F.2d 318, 320 (5th Cir.1981) for the proposition that tortious conversion does not violate the law of nations. In *Cohen*, an employee allegedly embezzled an employer's money and used the funds to buy property in Florida. To compare a simple case of employee theft with the Amended Complaint, which alleges military attacks on civilian targets using helicopter gunships and bombers, enslavement of civilians, and genocide, is, to say the least, hyperbolic.[31] While expropriation or property destruction alone may not violate the law of nations, the Court finds that expropriation or property destruction, committed as part of a genocide or war crimes, may violate the law of nations. *See, e.g. United States v. Krupp, cited in* Steven R. Ratner, *Corporations and Human Rights: A Theory of Legal Responsibility,* 111 Yale L.J. 443, 478 n. 134 (2001).[32]

■ Talisman apparently concedes that displacement violates international law. *See, e.g.,* Universal Declaration of

Human Rights, at art. 9; ICC STAT. art. 7 (listing deportation and forced transfer of population as crimes against humanity). However, it argues that plaintiffs have failed to allege details about what action Talisman took to assist Sudan in attacking them and forcing them to leave their villages. *See* Motion Brief, at 6–7. Given the nature of Amended Complaint, however, and in light of the fact that this is a motion to dismiss, not a motion for summary judgment, this argument lacks merit. Plaintiffs have alleged that Talisman was complicit with Sudan in "sanitizing" areas surrounding the oil concessions. They have alleged that Sudanese troops engaged in ethnic cleansing based upon a joint strategy formulated by Talisman and Sudan. *See* Amended Complaint, at ¶ 26. Although no discovery has taken place, plaintiffs quote a memo in which a Sudanese government official directed that "cleaning up operations" be conducted to fulfill the request of the "Canadian Company." *Id.* at ¶ 27. It would be an unfair and insurmountable burden, particularly at this stage, to require plaintiffs to allege the specific acts undertaken by Talisman and Sudan that lead to the attack on, for example, Mr. Cluol's village.[33]

### 3. Claims on Behalf of the Class

Under the heading, "Count I—International Law," plaintiffs allege that defendants violated the law of nations and customary international law "relating to

---

**31.** The other case cited by Talisman, *Jafari v. Islamic Republic of Iran,* 539 F.Supp. 209, 215 (N.D.Ill.1982) is also not on point, because that case involved expropriation without any underlying allegations of genocide or war crimes.

**32.** For example, *Kristalnacht* represented far more than property loss; it represented part of a systematic attempt by Nazis and others to eliminate Jewish life and culture in Germany.

**33.** It is notoriously difficult, if not impossible, to find a "smoking gun" revealing a concrete plan for "ethnic cleansing." Researchers have searched unsuccessfully for years to find a single document in which Hitler explicitly authorized the Holocaust, or in which Milosevic explicitly authorized the slaughter of Muslim civilians.

torture, slavery[,] the treatment of civilians during armed conflicts[,] and the treatment of ethnic and religious minorities and their property." Amended Complaint, ¶ 75. Talisman claims that, in fact, plaintiffs have failed to allege that Talisman committed any of these acts.

### a. Torture

 Talisman states that the term "torture" only appears in paragraph 75 and that the Amended Complaint fails to allege that Talisman or Sudan engaged in torture. Although the term "torture" is used colloquially, it has a discreet meaning in international law. The most commonly accepted definition is that found in the Torture Convention:

> [T]he term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Torture Convention, at art. 1(1). *Cf.* Torture Victim Protection Act of 1991, Pub.L. No. 102–256, 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350 note (Supp. V 1993). The Amended Complaint does not allege that Talisman or Sudan inflicted pain or suffering upon plaintiffs to obtain informa-

tion or confessions. However, the definition of torture also includes acts causing pain or suffering which are intentionally inflicted "for any reason based on discrimination of any kind" so long as such pain or suffering is inflicted "with the consent or acquiescence of a public official or other person acting in an official capacity." The Amended Complaint frequently alleges that Talisman conspired with, or aided and abetted, Sudan in its "ethnic cleansing" campaign against African non-Muslims. It can be inferred that military bombing raids, rapes [34], forced displacement, and extrajudicial killings caused "severe pain and suffering." Consequently, the Amended Complaint alleges torture, as long as plaintiffs can show that these acts were committed for any reason based on discrimination and with the consent or acquiescence of a public official or other person acting in an official capacity.

### b. Slavery

 Talisman similarly alleges that the Amended Complaint does not allege that Talisman utilized slave labor or that Talisman benefited from slave labor. This argument is irrelevant, because parties that conspire to commit acts of enslavement, or those that aid and abet parties who commit acts of enslavement, are potentially liable. The case Talisman cites for support, *Doe v. Unocal,* 110 F.Supp.2d 1294, 1309 (C.D.Cal.2000), was reversed by the Ninth Circuit. *But see supra* note 24. The Amended Complaint alleges that Talisman was complicit in Sudan's campaign of "ethnic cleansing" which included a policy of enslavement. Therefore dismissal is inappropriate at this stage.

### c. War Crimes

 Talisman claims that plaintiffs have not sufficiently alleged war crimes.

---

**34.** Rape can constitute torture. *See, e.g., Kadic v. Karadzic,* 70 F.3d 232, 242 (2d Cir.1995) (describing allegations of "murder, rape, forced impregnation, and other forms of torture [ . . .]."").

In particular, Talisman claims that it could not have committed war crimes because the Amended Complaint alleges that the acts it committed were "directed specifically at furthering its oil operations." Motion Brief, at 8. However, the fact that the desired end of Talisman's acts was the extraction of oil is irrelevant if it employed means that violated the law of nations. Plaintiffs, while noting that Talisman's primary interest was in oil extraction, not in "ethnic cleansing," allege that Talisman willingly worked with Sudan to commit acts of "ethnic cleansing" as a means of securing the oil supply:

> Defendants have collaborated in a joint strategy to deploy military forces in a brutal ethnic cleansing campaign against a civilian population based on their ethnicity and/or religion for the purpose of enhancing Defendants' ability to explore and extract oil from areas of southern Sudan by creating a *cordon sanitaire* surrounding the oil concessions located there.

Amended Complaint, at ¶ 1. *See also* Amended Complaint, at ¶¶ 26, 27, 29, 32, 33, 37, 58, 60, 61, 62. The fact that the allegedly unlawful acts also generated oil revenue does not mean they were not war crimes.

#### d. Treatment of Ethnic and Religious Minorities

■ Talisman claims that the "treatment of ethnic and religious minorities" does not violate the law of nations unless it rises to the level of genocide. While Amended Complaint ¶ 75 does not state the word "genocide", it is clear from the Amended Complaint as a whole that this is exactly what plaintiffs are alleging. Indeed, the terms "genocide" and "ethnic cleansing" [35] are peppered throughout the Amended Complaint. *See* Amended Complaint, at ¶¶ 1, 21, 23, 26, 33, etc. The Amended Complaint alleges, that Talisman pays Sudan to "protect" oil concession areas, knowing that "such 'protection' [ . . . ] includes ethnic cleansing or genocide [ . . . ]." Amended Complaint, at ¶¶ 31, 33. While poor treatment of an ethnic or religious minority might not always violate international law, the alleged acts committed by Talisman and Sudan would.

The Genocide Convention requires acts undertaken "with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such [ . . . ]." Genocide Convention, art. 2. Talisman then argues that the term "non-Muslim, African Sudanese minority" is not a potentially protected group. The Court holds otherwise. The term "non-Muslim" as applied to Sudan is simply a shorthand for "Christian and animist." To say that Sudan is attempting to wipe out its non-Muslim population is equivalent to saying that it is attempting to wipe out its Christian and animist population. *Cf.* Amended Complaint, at ¶ 14 (stating that Sudan's war against non-Muslim, African Sudanese is a "*jihad* "). Talisman provides no argument as to why "non-Muslims" do not constitute a religious group. In any event, the non-Muslim, African Sudanese minority certainly constitutes an ethnic group, and Talisman provides no evidence or analysis to the contrary. Consequently, plaintiffs do not fail to state a claim.

#### 4. Whether Talisman Acted Under Color of Law

■ Talisman claims that the law of nations does not apply to private individuals except when they act under color of state law or commit an offense of universal concern. Talisman concedes that slavery, war crimes (including those relating to the

---

35. *See supra,* note 2.

treatment of civilians during internal armed conflicts), and genocide are offenses of universal concern. *See Kadic v. Karadzic*, 70 F.3d 232, 241–43 (2d Cir.1995) (holding that genocide and war crimes can be committed by private actors without the need for state involvement). Talisman contends, however, that the allegations of torture and the (mis)treatment of ethnic and religious minorities and their property can only be imputed to Talisman if it acted under color of state law. Talisman's contention is incorrect. With respect to torture, the Second Circuit has recently held that there is no state action requirement if, as here, the torture is committed in the course of genocide or war crimes:

> We held in *Kadic* that war crimes and acts of genocide are actionable under the Alien Tort Claims Act without regard to state action, but that "torture and summary execution—*when not perpetrated in the course of genocide or war crimes*—are proscribed by international law only when committed by state officials or under color of law."

*Bigio v. Coca–Cola Co.*, 239 F.3d 440, 448 (2d Cir.2000) (emphasis added). With respect to the claims arising out of the treatment of ethnic and religious minorities, the Court has already held that plaintiffs are alleging genocide on the part of Sudan with Talisman in the role of co-conspirator or aider and abettor. Consequently, no showing of state action is necessary for any of the claims alleged in the Amended Complaint.

Regardless, the Court finds that the Amended Complaint adequately sets forth that Talisman acted under color of law. The case cited by Talisman with respect to whether or not Talisman acted under color of law is *NCAA v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). This case examined whether a state university's compliance with NCAA rules and regulations turned the NCAA's conduct into state action. A far more relevant and recent case is *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002). Unlike *NCAA*, which analyzed general color of law principles, *Wiwa* concerned whether the human rights violations of a foreign state could be imputed to a corporation operating in that country. The facts in *Wiwa* are nearly identical to those here. Looking at 42 U.S.C. § 1983 jurisprudence as a guide, Judge Wood held that the "relevant test in this case is the 'joint action' test, under which private actors are considered state actors if they are 'willful participant[s] in joint action with the State or its agents." *Id.* at *13. The *Wiwa* court also noted that "[W]here there is a substantial degree of cooperative action between the state and private actors in effecting the deprivation of rights, state action is present." *Id.* at *13 (citation omitted).

■ The *Wiwa* court held that a substantial degree of cooperative action was present between the corporate defendants and the government of Nigeria. This substantial degree of cooperative action included payments to the Nigerian government, corporate contracts for the purchase of arms, and coordination with the Nigerian government with respect to certain military attacks on civilians. *See id.* at *13. Likewise, in this case plaintiffs allege that Talisman paid Sudan for "protection" knowing that such protection included unlawful acts; that it purchased dual use military equipment and permitted the Sudanese military to use certain facilities to launch unlawful attacks on civilians; and that it helped plan a strategy involving "ethnic cleansing." Just as in Wiwa, plaintiffs have adequately pled a "substantial degree of cooperation" between Talisman and Sudan. Therefore, the Court finds

that Talisman can be treated as a state actor for purposes of the ATCA (though it reiterates, as noted *supra*, that such a finding is not necessary in light of the nature of plaintiffs' allegations).

### E. The Court has Personal Jurisdiction Over Talisman

Talisman next moves to dismiss on the basis of lack of personal jurisdiction. The Amended Complaint states that Talisman is a Canadian company headquartered in Calgary, Alberta, with operations in a variety of countries, including the United States. *See* Amended Complaint, at ¶ 3. Talisman allegedly conducts ongoing and significant business in the United States through wholly-owned subsidiaries Rigel and Fortuna. *See id.* at ¶ 4. Both Rigel and Fortuna conduct 100% of their business with or on behalf of Talisman, and plaintiffs allege that Talisman operates these wholly owned subsidiaries as departments or agents. *See id.* at ¶ 5. Moreover, Talisman officers and directors allegedly dominate the boards of Rigel and Fortuna. *See id.* at ¶ 5(a). Fortuna's business address is the same as Talisman's, and it has no separate financial standing. *See id.* at ¶ 5(b) and (c). Talisman is the agent of both Rigel and Fortuna. *See id.* at ¶ 5(d).

■ Ordinarily, when responding to a motion pursuant to FED. R. CIV. P. 12(b)(2) to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. *See Distefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir.2001). When a court relies merely on pleadings and affidavits, the plaintiff need only make a *prima facie* case showing that the court has personal jurisdiction over the defendant. *See id.* at 84. In this case, however, the Court informed plaintiffs' counsel orally at a conference on March 19, 2002, that no discovery would be allowed with respect to the question of personal jurisdiction prior to the Court's determination of defendant's motion. *See* Declaration of Stephen A. Whinston, June 26, 2002, at ¶¶ 17–18. At that time, the Court instructed plaintiffs' counsel that plaintiffs could satisfy their initial burden by pleading facts sufficient to demonstrate a need for discovery on that issue. *See id.* at ¶ 18. In making that determination, the Court construes the Amended Complaint in the light most favorable to plaintiffs.

■ Under the Federal Rules of Civil Procedure, a court may exercise jurisdiction over any defendant who "could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located," assuming such exercise of jurisdiction meets the due process requirements of the Fifth Amendment. FED. R. CIV. P. 4(k)(1)(A). Under New York, law, a foreign corporation is subject to general personal jurisdiction if it is "doing business" in the state. N.Y. C.P.L.R. § 301. The Second Circuit analyzed the concept of "doing business" in *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir.2000):

> [A] corporation is "doing business" and is therefore "present" in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York "not occasionally or casually, but with a fair measure of permanence and continuity."

(quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985)). In order to meet this standard, a plaintiff must show that a defendant engaged in "continuous, permanent, and substantial activity in New York." *Wiwa*, 226 F.3d at 95.

■ The continuous presence and substantial activities need not be conduct-

ed by the foreign corporation itself. Indeed, personal jurisdiction may be based upon activities performed on behalf of a foreign corporation by an agent:

> Under well-established New York law, a court of New York may assert jurisdiction over a foreign corporation when it affiliates itself with a New York representative entity and that New York representative renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available.

*Wiwa*, 226 F.3d at 95. In order to come within the ambit of this rule, "a plaintiff need demonstrate neither a formal agency agreement, nor that the defendant exercised direct control over its putative agent." *Id.* at 95 (internal citations omitted). However, the agent must be primarily employed by the defendant and not be engaged in similar services for other clients. *See id.* at 95.

Like the instant case, *Wiwa* concerned an ATCA suit by various plaintiffs against a large oil concern for alleged human rights violations in Africa. The defendants in that case were incorporated in the Netherlands and England. However, both were listed on the New York Stock Exchange, ("NYSE") prepared filings for the Securities and Exchange Commission in New York, and employed transfer agents and depositories in New York for their shares. In *Wiwa*, the named defendants owned a subsidiary (a Delaware corporation) that in turn owned a subsidiary that conducted extensive operations in New York. Defendants in *Wiwa* also maintained an investor relations office in New York City that was nominally owned by the subsidiary of the subsidiary. The *Wiwa* court held that the defendants' listing on the New York Stock Exchange, coupled with the maintenance of an investor relations office in New York, subjected the two foreign corporations to jurisdiction in New York.

In the instant case, Talisman is a Canadian company that is traded on the NYSE. Talisman states, citing *Wiwa*, that a New York Stock Exchange listing is not enough to confer personal jurisdiction. Talisman is correct, but ignores the balance of the Second Circuit's argument. In *Wiwa*, the Second Circuit held that personal jurisdiction does not exist when a corporation's "*only* contacts with the forum are listings on the New York stock exchanges and ancillary arrangements involving the distribution of their shares." *Wiwa*, 226 F.3d at 97 (emphasis in original). However, the Second Circuit emphasized that "it is not that activities necessary to maintain a stock exchange listing do not count, but rather that, without more, they are insufficient to confer jurisdiction." *Id.* at 97. Consequently, the fact that Talisman is listed on the New York Stock Exchange is a factor militating in favor of conferring jurisdiction on this Court. If plaintiffs alleged only this fact and nothing more, personal jurisdiction would not exist, as per the Second Circuit's directive in *Wiwa.* However, as in *Wiwa*, plaintiffs have alleged numerous additional links to New York.

Beyond Talisman's listing on the NYSE, plaintiffs have alleged that Fortuna, a wholly owned subsidiary of Talisman, serves as a department or agent of Talisman and conducts significant operations in New York. Plaintiffs also contend, *inter alia*, that Talisman's officers and directors dominate the Fortuna board, that Fortuna has no separate financial standing, that Fortuna and Talisman share the same address, and that Talisman posts corporate bonds for Fortuna. Talisman's statement that the mere ownership by a

parent company of a subsidiary subject to personal jurisdiction in the forum state is insufficient to confer jurisdiction is therefore irrelevant, because plaintiffs allege a number of links between Talisman and its subsidiaries, including Fortuna. Talisman's statement that the subsidiaries are engaged in business unrelated to the issues in this litigation and that therefore jurisdiction does not lie is incorrect. Once a corporation is found to be doing business in the forum, jurisdiction lies with respect to "any cause of action, related or unrelated to the New York contacts." *Wiwa,* 226 F.3d at 88 (citations omitted). Indeed, in *Wiwa,* the Second Circuit upheld a finding of personal jurisdiction based in part on the existence of a New York investor relations office, whose business was entirely unrelated to the parent companies' activities in Nigeria. At this stage, plaintiffs' allegations are sufficient to confer jurisdiction and entitle them to conduct discovery on the matter.[36]

### F. Plaintiffs Have Standing to Assert Claims

 Talisman alleges that both the organizational and individual plaintiffs lack standing to assert claims in this case. The doctrine of standing is constitutional in nature and stems from the dictates of Article III. Any analysis of standing must be guided by the Supreme Court's decision in *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In that case, the Court held that in order to meet the standing requirement, "[a] plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Id.* at 751, 104 S.Ct. 3315.

### 1. The Organizational Plaintiffs Have Standing

Talisman alleges that the Presbyterian Church has failed to meet the first element of *Allen* because it has not suffered any injury that gives rise to a cause of action under the ATCA. Talisman concedes that the Presbyterian Church and NCDS have standing to assert claims for property loss, but states that such injuries are not cognizable under the law of nations. However, property damage may violate the law of nations when committed in the context of a genocide or war crimes, as noted *supra.*

More importantly, both organizations are suing in a derivative capacity; that is, on behalf of their members. Both parties agree that the relevant case on point is *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). That case held that an association has standing to bring suit on behalf of its members when: "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343, 97 S.Ct. 2434.

Talisman does not dispute that the organizational defendants in this case meet the first prong of *Hunt.* With respect to the second prong, Talisman argues that the purposes of the Presbyterian Church and NCDS are unrelated to this action. The Court disagrees. With respect to the Presbyterian Church, Talisman cites *Mussington v. St. Luke's–Roosevelt Hosp.,* 824 F.Supp. 427, 431 (S.D.N.Y. 1993), *aff'd* 18 F.3d 1033 (2d Cir.1994) for

---

**36.** Because the Court finds that plaintiffs have made a *prima facie* showing of personal jurisdiction, the Court need not consider whether personal jurisdiction might exist by virtue of the universality principle. *See* Restatement (Third) of Foreign Relations § 702 (1987).

the proposition that churches are not appropriate associational plaintiffs "merely because they are concerned with the well-being of their community and feel it threatened by other parties." Talisman's quotation of *Mussington* is misleading, however, because it omits the first half of that sentence, which states in part that "churches may certainly deserve associational standing in certain cases, for example, those involving religious issues [. . .]." *Id.* at 431. Far from supporting Talisman's contention that the Presbyterian Church should not have standing, *Mussington* in fact supports the opposite conclusion. Unlike *Mussington*, which involved an effectively secular dispute, here plaintiffs allege the commission of a genocide and war crimes based in substantial part upon plaintiffs' religion. Indeed, even a cursory glance at Sudan's troubled history adds credence to the allegation of plaintiffs that Talisman is assisting Sudan in its *"jihad"* against non-Muslims. Amended Complaint, at ¶ 14. Moreover, plaintiffs allege that the Presbyterian Church's churches have been targeted by Government forces and that its leaders and parishioners have been killed. Plaintiffs suggest, and the Court is inclined to agree, that a central part of a church's function is to protect its clergy and lay members from attacks and discrimination based on their religion. Whether or not this is the Presbyterian Church's primary function, the interests it seeks to protect in this case are certainly "germane" to its purposes. *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

Talisman also claims that NCDS's interest in this action is not germane to its purpose as an organization. Talisman quotes the Amended Complaint, stating that NCDS is "dedicated to assisting Nuer refugees." Amended Complaint, at ¶ 2(c). According to Talisman, because NCDS's members are U.S. citizens or resident aliens, they are not "non-Muslim, African Sudanese residents" and therefore not part of the class. Talisman's argument is misleading, because it only quotes the Amended Complaint selectively. According to the Amended Complaint, NCDS is "dedicated to assisting Nuer refugees in the United States," as Talisman states, but is also dedicated to assisting "those remaining in Sudan who are victims of the ethnic cleansing campaign to secure their land for oil development." *Id.* at ¶ 2(c). By only quoting half of the sentence, Talisman gives the false impression that NCDS's purpose is solely to help Nuer refugees living outside of Sudan, and ignores the allegation that NCDS is also dedicated to assisting Nuer people who remain in Sudan and who are victims of the "ethnic cleansing" campaign. Given that NCDS's purpose includes assisting current victims of the alleged "ethnic cleansing" campaign in Sudan, the interests NCDS seeks to vindicate are not only germane to its purpose but central to it.

■ Turning to the third prong of *Hunt,* Talisman contends that each of the claims asserted by the organizational plaintiffs requires the participation of individual members. Specifically, Talisman claims that the organizational plaintiffs lack standing because the damage claims of the members are not common to the entire membership nor shared by all in equal degree. Instead, Talisman argues that participation by individual members is required to determine the level of compensatory damages. It also argues, without providing any legal or logical analysis, that neither organization can seek injunctive relief because "the grant of relief is dependent on alleged harm to individual plaintiffs which can only be adjudicated by considering the testimony and evidence of those individuals." Motion Brief, at 15. With respect to compensatory damages

(Talisman does not address punitive damages at this point), the Court notes that there are a number of individual named plaintiffs. Moreover, the instant action is a class action pursuant to FED. R. CIV. P. 23. In light of those factors, the Court rejects Talisman's argument, and finds that both the Presbyterian Church and NCDS have standing in this case. The Court also rejects Talisman's cryptic claim that a plaintiff-by-plaintiff assessment of damages are required in order to consider whether to enjoin defendants from continuing to cooperate or assist in waging "ethnic cleansing" against the non-Muslim, African Sudanese population.

 The Court also notes that the Second Circuit has previously confronted a case in which organizational plaintiffs together with individual plaintiffs sued a defendant under the ATCA seeking damages and injunctive relief because of the alleged commission of genocide and gross human rights violations. In *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995), plaintiffs included individuals as well as the *Internationalna Iniciativa Zena Bosne I Hercegovine "Biser"* and *Zene Bosne I Hercegovine*, two organizations dedicated to helping victims of the atrocities being committed in the former Yugoslavia. As Talisman notes, standing is a constitutional issue. Reviewing courts therefore have a duty to raise the issue *sua sponte* even when none of the parties addresses standing. *See Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 82 (2d Cir.1996) ("Neither party raises the standing issue on appeal, but because it is jurisdictional, *see Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir.1994), we must examine the issue *sua sponte* when it emerges from the record"). The fact that the *Kadic* court did not dispute the organizations' standing to file suit further supports the standing of the organizational plaintiffs in this case.

## 2. The Individual Plaintiffs Have Standing

Talisman contends that the individual named defendants lack standing to bring this action. Its first argument is that plaintiffs fail to allege injuries "fairly traceable" to Talisman's actions. According to Talisman, plaintiffs' injuries resulted from the acts of Sudan, not of Talisman. The Court has already refuted this argument above. As noted, international law makes clear that incitement to genocide, as well as complicity in gross human rights violations, violates international law. For example, the United States Military Tribunal, trying post-World War II war criminals, embraced a wide-ranging conception of complicity:

> This is but an application of general concepts of criminal law. The person who persuades another to commit murder, the person who furnishes the lethal weapon for the purpose of its commission, and the person who pulls the trigger are all principals or accessories to the crime.

*United States v. Alstötter*, 6 L. Rep. Tr. War Crim. 1, 62 (1948). The International Criminal Tribunal for the former Yugoslavia has similarly held that "direct contribution does not necessarily require the participation in the physical commission of the illegal act," and that "participation in the commission of the crime does not require an actual physical presence or physical assistance [...]." *Prosecutor v. Tadic* (Case No. IT–94–1–T), Opinion and Judgment, May 7, 1997, at ¶¶ 678, 691. The Amended Complaint sets forth allegations of Talisman's complicity with Sudan in its campaign of "ethnic cleansing." The Court therefore rejects this argument.

 Talisman also argues that the individual plaintiffs lack standing to assert claims on behalf of third parties who may

have suffered injuries. Talisman states that a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," quoting *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir.2001). The quoted language in *Altman* in fact comes from *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *Warth* concerned certain zoning policies that were allegedly discriminatory against the poor and racial minorities. Certain individual plaintiffs in the purported class action were poor and members of racial minorities. However, while alleging these shared characteristics, they failed to allege that they themselves were injured by the zoning policies:

> [T]he fact that these petitioners share attributes common to persons who may have been excluded from residence in the town is an insufficient predicate for the conclusion that petitioners themselves have been excluded, or that the respondents' assertedly illegal actions have violated their rights.

*Warth*, 422 U.S. at 502, 95 S.Ct. 2197. In contrast, in the instant case the individuals not only share certain characteristics with the class by being non-Muslim African Sudanese, but they also allege specific injuries allegedly caused by defendants' actions. Talisman further claims that standing requires a close relation to the third party as well as some hindrance to the third party's ability to protect his or her own interests, citing *Tasini v. New York Times*, 184 F.Supp.2d 350, 357 (S.D.N.Y.2002). While this is generally correct, it does not necessarily hold true in the context of class actions.[37] While

each member of the class must have standing with respect to injuries suffered as a result of defendants' actions, the named plaintiffs do not need to have a "close relation" to the other class members so long as the strictures of FED. R. CIV. P. 23 are followed.

Indeed, as plaintiffs correctly note, Talisman's argument in this section is incorrect because it conflates standing under Article III of the Constitution with the class action requirements of FED. R. CIV. P. 23. Talisman argues, in effect, that plaintiffs do not adequately represent other alleged victims of defendants' conduct. Whatever the merits of Talisman's position, they fall under the rubric of Rule 23 and not standing.[38] Therefore, the arguments should be raised when plaintiffs move for class certification. *See* 1 NEWBERG ON CLASS ACTIONS § 2.07 (3d ed.) ("Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 [ . . . ]."). *See also Open Hous. Ctr. v. Samson Mgmt. Corp.*, 152 F.R.D. 472, 476 (S.D.N.Y.1993) ("standing to sue [ . . . ] is separate and distinct from the issue of whether the class representatives have claims that are typical of the proposed class members.").

### 3. Plaintiffs Have Standing to Assert Claims Based on Arakis's Conduct

■ Talisman alleges that plaintiffs fail to allege that they have suffered injuries as a result of conduct by Arakis. Plaintiffs

---

37. *Tasini*, it should be noted, was not a class action.

38. This fact is underscored by the fact that a central case cited by Talisman for support in its Reply Memorandum of Law in Further

Support of Defendant Talisman Energy Inc.'s Motion to Dismiss, *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283 (2d Cir.1999), concerns class certification under Rule 23, not standing.

allege, however, that Talisman succeeded to Arakis's assets and liabilities, and that Arakis was complicit in the alleged "ethnic cleansing." *See* Amended Complaint, at ¶¶ 3, 18, 21, 22, 23, 24. This allegation must be accepted as true at this stage. Talisman claims that to the extent that Garbang alleges claims for injuries stemming from 1994, she fails to allege that Arakis caused those injuries. However, the Amended Complaint does state that the 1994 attack was "part of the Government's ethnic cleansing campaign against non-Muslim, African Sudanese *in the oil producing areas* [...]." Amended Complaint, at ¶ 2(e). Examining this language in the context of the Amended Complaint as a whole, the clear implication is that Arakis was complicit with Sudan in causing the 1994 injuries. To the extent that Talisman is arguing that the named plaintiffs were injured at different times than other members of the class, the question is one of typicality which should be raised when plaintiffs seek to have the class certified.

## G. The Doctrine of *Forum Non Conveniens* Does Not Mandate Dismissal

 Talisman argues that the doctrine of *forum non conveniens* mandates dismissal of the action. The doctrine permits a court to dismiss a claim, "even if the court is a permissible venue with proper jurisdiction over the claim", in order to allow the action to be tried elsewhere for the convenience of litigants and witnesses. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir.2000). The grant or denial of a motion to dismiss for *forum non conveniens* reasons is generally "committed to the district court's discretion." *Wiwa*, 226 F.3d at 99. However, the Second Circuit, in the context of an ATCA claim, has recently cautioned courts that dismissal should be granted in "rare instances," and the plaintiff's choice of forum

should "rarely be disturbed." *Id.* at 100. In assessing whether or not to grant a dismissal based on the doctrine of *forum non conveniens*, a two step analysis is required. First, the court must determine whether an adequate alternative forum exists. Second, if such a forum exists, the court must undertake a balancing test and weigh several factors involving the private interests of the parties and the public interests at stake. *See id.* at 100. The test for *forum non conveniens* is not a simple matter of which side has the weightier argument. Instead, the burden is on the defendant to show that the factors tilt "strongly" in favor of trial in a foreign forum. *Id.* at 100.

### 1. Adequate Forum Analysis

Talisman argues that both Sudan and Canada are adequate alternative fora. The Court finds that Sudan is not an adequate alternative forum, but assumes, without so deciding, that Canada is.

### a. Sudan is Not an Adequate Alternative Forum

Talisman suggests that plaintiffs bring their claims in Sudan. In support of this claim, Talisman includes an affidavit by Dr. Abdel Rahman Ibrahim el Khalifa, an associate professor of law at the University of Khartoum. The affidavit outlines in detail procedures and jurisprudence of the Sudanese judicial system. Notably absent from the affidavit, however, is any statement indicating that the Sudanese judicial system is fair and free from corruption, and that plaintiffs, who are alleging that Sudan committed genocide and war crimes, could get a fair trial. Plaintiffs' expert, Dr. Abdullahi Ahmed An-Na'im addresses this point, and notes that plaintiffs, who are non-Muslims, enjoy greatly reduced rights in Sudan under the system of Islamic law (*Shari'a*) in place. *See*

Affidavit of Dr. Abdullahi Ahmed An–Na'im, at ¶¶ 8, 17, 18. These reduced rights include a total lack of legal personality for plaintiffs who practice traditional African religions, and diminished testimonial competence for Christians. *See id.* at ¶ 17. Dr. An–Na'im concludes that "the trial of this case in Sudan will result in a total failure of justice." *Id.* at ¶ 9.

▆▆ Putting aside for the moment the fact that Sudan has been classified as a state sponsor of terrorism, *see* Amended Complaint, at ¶ 13, at this stage, the Court is obligated to accept the allegations of plaintiffs as true. It would be rather surprising if the government of Sudan conducted a war of "ethnic cleansing" against plaintiffs and at the same time granted them a fair judicial process to remedy those injuries. In addition, it would be perverse, to say the least, to require plaintiffs to bring this suit in the courts of the very nation that has allegedly been conducting genocidal activities to try to eliminate them. The Second Circuit has been cognizant of this fact and has not required alleged victims of gross human rights violations to file suit in the place where the alleged violations occurred:

> One of the difficulties that confront victims of torture under color of a nation's law is the enormous difficulty of bringing suits to vindicate such abuses. Most likely, the victims cannot sue in the place where the torture occurred. Indeed, in many instances, the victim would be endangered merely by returning to that place. It is not easy to bring such suits in the courts of another nation. Courts are often inhospitable. Such suits are generally time consuming, burdensome, and difficult to administer. In addition, because they assert outrageous conduct on the part of another nation, such suits may embarrass the government of the nation in whose

courts they are brought. Finally, because characteristically neither the plaintiffs nor the defendants are ostensibly either protected or governed by the domestic law of the forum nation, courts often regard such suits as "not our business."

*Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 106 (2d Cir.2000). This Court made the same determination in *Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189, 1199 (S.D.N.Y.1996). In that case, this Court denied the defendant's motion to dismiss on the grounds of *forum non conveniens* in part because the plaintiff would be "putting himself in grave danger" were he to return to Ghana where he had allegedly been tortured. This Court also noted that "[a] motion to relegate a plaintiff to a foreign forum will be denied if the plaintiff shows that foreign law is inadequate, or that conditions in the foreign forum plainly demonstrate that the plaintiffs are highly unlikely to obtain basic justice therein." *Id.* at 1199 (quoting *Rasoulzadeh v. Associated Press,* 574 F.Supp. 854 (S.D.N.Y. 1983), *aff'd,* 767 F.2d 908 (2d Cir.1985)). In light of the almost self-evident fact that, if plaintiffs' allegations are true, plaintiffs would be unable to obtain justice in Sudan and might well expose themselves to great danger in trying to do so, the Court finds that Sudan is not an appropriate forum under *forum non conveniens* analysis.

### b. The Court Assumes that Canada is an Adequate Forum

Having found that Sudan would not be an appropriate alternative forum, the Court examines whether Canada would be. Talisman encloses the affidavits of two accomplished Canadian lawyers: Christopher D. Bredt of the Ontario bar and Frank R. Foran of the Alberta bar. The Court will assume, without deciding, that plaintiffs would be able to receive a fair

trial in Canada, notwithstanding the fact that Talisman is a Canadian company.

Plaintiffs do not address the question of whether Canada is an adequate alternative forum, and concentrate on the balancing test prong of the *forum non conveniens* test. While Canadian courts may be fair and impartial, there are aspects of the substantive law which would be applied in Canadian courts which make Canada an inadequate alternative forum. A preliminary issue is the choice of law that would be applied. Mr. Foran notes that an Alberta court would, *prima facie*, apply the *lex loci delicti*, or the law of the place where the activity occurred. In this case, that would mean that the Alberta court would apply Sudanese, *Shari'a* law. However, as noted above, under Sudanese law, plaintiffs as non-Muslims would enjoy greatly reduced rights. Given this fact, it is difficult to see how a Canadian court applying *Shari'a* law would be a great improvement over a Sudanese court applying *Shari'a* law. While Mr. Foran notes that the Canadian Supreme Court has held that domestic law could be applied instead of international law to avoid injustice, that court also held that it envisioned "few cases where this would be necessary." *Tolofson v. Jensen,* [1994] 3 S.C.R. 1022, at ¶ 50. Mr. Bredt's affidavit does not address whether Sudanese law could be applicable were this action transferred to an Ontario court.

Assuming, however, that a Canadian court (either Alberta or Ontario) would apply domestic law, another problem remains. Both Mr. Foran and Mr. Bredt set forth the potential causes of action plaintiffs would have in Alberta and Ontario courts. These causes of action included a variety of common law claims (battery,

false imprisonment, assault, intentional infliction of mental suffering, conspiracy, unlawful interference with economic interests, trespass to chattels, and negligence). *See* Affidavit of Frank R. Foran, at ¶ 15–16; Affidavit of Christopher D. Bredt, at ¶ 12. In addition, both affidavits discuss various statutory causes of action. *See* Affidavit of Frank R. Foran, at ¶ 17; Affidavit of Christopher D. Bredt, at ¶¶ 13–15, However, neither affidavit makes any mention of a cause of action for violations of the law of nations, and in particular, for *jus cogens* violations thereof.

The concern is that the causes of action available do not reflect the gravity of the alleged offenses, and in particular, the universally-condemned nature of these acts. The offenses alleged in the Amended Complaint are considered international crimes entailing individual responsibility and subject to universal jurisdiction precisely because they constitute a fundamental affront to the international order. Such crimes are more than the sum of their parts. Genocide may quantitatively be the same as a large number of murders, but it is qualitatively different, and this difference is recognized by the fact that the act enjoys special status under international law. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS §§ 404, 702 (1987). While plaintiffs may be able to obtain the same relief in Canadian courts that they seek in this jurisdiction, it is evident from the affidavits provided that Canadian courts will only be able to treat plaintiffs' allegations as violations of Canadian, rather than international law. Because this treatment fails to recognize the gravity of plaintiffs' allegations, the Court questions whether Canadian courts (in either Alberta or Ontario) would be adequate alternative fora.[39]

---

**39.** The Court also notes that "Canada does not have a well-developed class action procedure." *Derensis v. Coopers & Lybrand Char-* *tered Accountants,* 930 F.Supp. 1003, 1007 (D.N.J.1996).

However, plaintiffs do not challenge Talisman's assertion that Canadian courts would be adequate alternative fora. In light of this fact, the Court assumes, without so deciding, that Canadian courts would be adequate alternative fora.

## 2. Weighing the Interests at Stake

Assuming, *arguendo*, that Canadian courts are adequate alternative fora, the Court must now weigh the various public and private interests at stake. In so doing, the Court is cognizant that the burden is on Talisman to show that the factors tilt "strongly" in favor of trial in a foreign forum. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir.2000).

The *Wiwa* case is directly on point but is only cited peripherally by Talisman. *Wiwa* involved several Nigerian citizens resident in the United States who sued a British and Dutch company under the ATCA for alleged gross human rights violations including crimes against humanity and torture. The district court dismissed the case based on *forum non conveniens* grounds. The Second Circuit reversed the decision, and stated that the district court had failed to give weight to three significant considerations in favor of retaining jurisdiction for trial:

> (1) a United States resident plaintiff's choice of forum;
>
> (2) the interests of the United States in furnishing a forum to litigate claims of violations of the international standards of the law of human rights; and
>
> (3) the factors that led the district court to dismiss in favor of a British forum were not particularly compelling.

*Wiwa*, 226 F.3d at 101. An analysis of each of these factors in the instant case similarly reveals that dismissal on *forum non conveniens* grounds would be improper.

### a. Deference to a Choice of U.S. Forum by a U.S. Resident Plaintiff

In the instant case, NCDS, Garbang, and Cluol are all United States residents. *See* Amended Complaint, at ¶ 2(c), (e), and (f). The Presbyterian Church may also have members who are United States residents. *See id.* at ¶ 2(a). The *Wiwa* court held that a "plaintiff's choice of forum is entitled to substantial deference and should only be disturbed if the factors favoring the alternative forum are compelling." *Wiwa*, 226 F.3d at 101. The Second Circuit went on to explain that while all plaintiffs are entitled to some degree of deference, that deference increases when the plaintiffs are citizens or residents. *See id.* at 101–02. The Second Circuit's determination that residents are entitled to substantial deference was based on its analysis of Supreme Court precedent:

> During the last two decades, our caselaw and that of the Supreme Court has *clearly and unambiguously* established that courts should offer greater deference to the selection of a U.S. forum by U.S. resident plaintiffs when evaluating a motion to dismiss for *forum non conveniens*.

*Wiwa*, 226 F.3d at 102 (emphasis added). The rule that United States citizens and residents are entitled to greater deference in their forum choice is not based on "chauvinism or bias" but on the fact that United States residents and plaintiffs have greater ties to the United States and therefore would be more inconvenienced by a requirement that they file suit in another jurisdiction. *Id.* at 102.

▮ The Court notes that NCDS is incorporated in Minnesota, that Garbang is an Illinois resident, and that Cluol is an Iowa resident. In short, while several plaintiffs are United States residents, none is a New York resident. Similarly, in *Wiwa*, none of the plaintiffs was a resident

of New York. The district court in that case had weighed that fact against plaintiffs. As the Second Circuit has made clear, that was reversible error:

> In this case, the district court weighed against the plaintiffs that none of them were [sic] residents of the Southern District of New York but did not count in favor of their choice of a U.S. forum that two of them were residents of the United States. This was error.

*Wiwa,* 226 F.3d at 103. For purposes of a *forum non conveniens* determination, the home forum of any United States resident is any United States Court. *See id.* at 103. Thus, the fact that none of the plaintiffs in the instant case is a resident of the Southern District is irrelevant. The fact that none of the individual plaintiffs is a United States citizen is similarly irrelevant: "We have never accorded less deference to a foreign plaintiff's choice of a United States forum where that plaintiff was a U.S. resident." *Wiwa,* 226 F.3d at 103. The fact that the case is a class action suit does not necessarily mean that less deference is due. *See, e.g., In re: Assicurazioni Generali S.p.A. Holocaust Ins. Litigation,* 228 F.Supp.2d 348, 352 (S.D.N.Y.2002) (deference is due "notwithstanding the fact that plaintiffs are acting in a representative capacity" where plaintiffs had legitimate reasons for bringing suit in the forum).

That several plaintiffs are U.S. residents differentiates the case from a recent Second Circuit case cited by Talisman, *Aguinda v. Texaco, Inc.,* 303 F.3d 470 (2d Cir. 2002). In that case, which like *Wiwa* was authored by Judge Leval, the court upheld dismissal on *forum non conveniens* grounds. However, in *Aguinda,* all of the plaintiffs and all members of their putative classes were living in Ecuador or Peru. *See Aguinda v. Texaco, Inc.,* 303 F.3d 470, 479 (2d Cir.2002). Consequently, unlike the instant plaintiffs, the *Aguinda* plaintiffs

were entitled to no greater degree of deference in their choice of forum.

### b. U.S. Interest in Vindicating International Human Rights Violations

A second factor militating against dismissal on *forum non conveniens* grounds is the strong United States interest in vindicating international human rights violations. In this case, plaintiffs seek redress for *jus cogens* violations of international law. As noted above, the allegations include charges of genocide, war crimes, torture, and enslavement. These acts are universally condemned, and the United States has a strong interest in seeing violations of international law vindicated. *See, e.g., Testa v. Katt,* 330 U.S. 386, 390 n. 4, 67 S.Ct. 810, 91 L.Ed. 967 (1947). The Second Circuit in *Wiwa,* a case that also alleged major human rights violations including torture and crimes against humanity, reversed a district court decision granting dismissal on the basis of *forum non conveniens,* in part because the "district court did not accord proper significance [. . .] to the policy interest implicit in our federal statutory law in providing a forum for adjudication of claims of violations of the law of nations." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 100 (2d Cir. 2000). This is not to say that the United States has a small interest in adjudicating ATCA claims alleging non-*jus cogens* violations; rather, the Second Circuit's holding in *Wiwa* indicates that the United States has an interest in addressing international law violations (through suits under the ATCA), most notably where the allegations include "claims of violations of the international standards of the law of human rights." *Wiwa,* 226 F.3d at 101.

According to Talisman, "[n]either the United States nor New York has more than a minimal interest in adjudicating in

New York a case on behalf of a Sudanese class against a Canadian corporation relating to alleged events wholly within Sudan." Motion Brief, at 20. In making this statement, Talisman fails to recognize the significance of the fact that the Amended Complaint alleges *jus cogens* violations of international law such as genocide, war crimes, torture, and enslavement. As noted *supra*, these acts are universally abhorrent and entail individual responsibility. Because of the nature of the alleged acts, the United States has a substantial interest in affording alleged victims of atrocities a method to vindicate their rights. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 106 (2d Cir.2000) (in the context of torture, "suits should not be facilely dismissed on the assumption that the ostensibly foreign controversy is not our business").[40]

The grave nature of the allegations in this case make it similar to *Wiwa* and distinguishes it from several recent cases cited by Talisman. For example, in *Aguinda v. Texaco, Inc.,* 303 F.3d 470 (2d Cir.2002), the Second Circuit upheld a dismissal based on *forum non conveniens* grounds. In addition to the fact that none of the plaintiffs in that case was a United States resident (as noted *supra*), the allegations in *Aguinda* were that Texaco had caused environmental damage and personal injuries. While the *Aguinda* court did not address subject matter jurisdiction, it is well-established that environmental damage, without more, generally does not violate international law. *See, e.g., Flores v. So. Peru Copper Corp.,* No. 00 Civ. 9812, 2002 WL 1587224, at *11 (S.D.N.Y. July 16, 2002). Similarly, Talisman has called the Court's attention to *Abdullahi v. Pfizer, Inc.,* No. 01 Civ. 8118, 2002 WL

31082956 (S.D.N.Y. Sept. 17, 2002). In that case, the district court dismissed an action on *forum non conveniens* grounds in which plaintiffs alleged that the defendant had conducted medical experimentation on them. The *Abdullahi* court noted specifically that "the conduct alleged here, however reprehensible, falls short of constituting a [Restatement (Third) of Foreign Relations] section 404 violation of 'universal concern.'" *Id.* at *5. The interest of the United States in adjudicating the case was therefore less great than it is in the instant case, where plaintiffs allege genocide, war crimes, torture, and enslavement, all of which are *jus cogens* violations of "universal concern."

### c. Weighing of Other Factors

An examination of other factors in this case indicate that dismissal would be inappropriate. The factors cited by Talisman include the fact that Talisman is headquartered in Canada and that its records are located in Alberta. These factors weigh only slightly in Talisman's favor. First, the argument that Talisman needs to litigate the case where it is headquartered is undermined by the fact that Talisman also seeks to dismiss the action in favor of the much more distant forum of Sudan. Second, large corporations like Talisman routinely litigate cases outside of their home jurisdiction. Third, as plaintiffs point out, "the need to photocopy and ship documents is hardly unprecedented in American litigation." *DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 66 (2d Cir.2000). Talisman also argues that witnesses are located in Canada. This argument similarly is not entitled to great weight, especially given that Talisman has suggested that this action be dismissed in favor of an action to

---

40. The quoted language was in reference to the Torture Victim Protection Act, promulgat-

ed under the ATCA, 28 U.S.C. § 1350.

be brought in Sudan. By all accounts, New York City constitutes a more convenient transportation hub than Khartoum. To the extent that Talisman employees would have to travel from Calgary, Alberta to New York, this does constitute an inconvenience, but not a particularly oppressive one. Moreover, Talisman has not provided the Court with any information as to the particular witnesses who reside in Canada who would be called. Such a list of witnesses has been held to be a prerequisite for *forum non conveniens* dismissal. *See, e.g., Weltover, Inc. v. Republic of Argentina,* 753 F.Supp. 1201, 1209 (S.D.N.Y.1991) ("In the absence of such information, the Court cannot assess how defendant will be prejudiced by litigation in New York."). *Cf. Calavo Growers of California v. Generali Belgium,* 632 F.2d 963, 969 (2d Cir.1980) (Newman, J., concurring) ("It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit."). With respect to Sudan, Talisman presents no evidence that litigating this action in New York would be less convenient than litigating it in Canada. Indeed, common sense would indicate that in light of the existing Sudanese presence in New York (by virtue of its permanent mission to the United Nations) litigating the case here would be more convenient than Canada.

A countervailing factor is the relative means of the parties. As in *Wiwa,* Talisman has not demonstrated that the costs of litigating this action in New York would be excessively burdensome, especially in view of its vast resources. *See Wiwa,* 226 F.3d at 107. In this case, defendants clearly have the upper hand when it comes to resources. The relative poverty of plaintiffs is a factor the Court may consider:

> [T]he additional cost and inconvenience to the defendants of litigating in New York is fully counterbalanced by the costs and inconvenience to the plaintiffs of requiring them to reinstitute the litigation in [the foreign forum]—especially given the plaintiffs' minimal resources in comparison to the vast resources of the defendants.

*Wiwa,* 226 F.3d at 107. In addition, as in *Wiwa,* plaintiffs in this case have obtained excellent pro bono counsel to litigate this case. This factor, too may be considered by the Court. *See Wiwa,* 226 F.3d at 108 n. 13 ("plaintiffs have already obtained excellent pro bono counsel [ . . . ]; there is no guarantee that they will be able to obtain equivalent representation in [the foreign forum] without incurring substantial expenses.").

██ While it might be more convenient for Talisman to litigate this case in its home forum, this inconvenience is substantially outweighed by the much greater inconvenience plaintiffs would face if they were forced to litigate this action in Canada. Having considered all of the relevant factors, the Court holds that Talisman has failed to justify its motion to dismiss this action on the grounds of *forum non conveniens* because it has not shown that pertinent factors "tilt strongly" in favor of trial in the foreign forum. *Wiwa,* 226 F.3d at 100.

## H. Principles of International Comity do Not Bar this Action

██ Talisman argues that principles of international comity counsel against this Court asserting jurisdiction over the action. In particular, it argues that Sudan and Canada have strong interests in resolving the dispute which serves as the basis for this action. Talisman's notion of comity is more far-reaching than the traditional conception of what that term means. International comity has been defined as the "recognition which one nation allows

within its territory to the legislative, executive or judicial acts of another nation." *Bigio v. Coca–Cola Co.,* 239 F.3d 440, 454 (2d Cir.2000) (quoting *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895)). Here, however, Talisman does not point to any particular legal decision or even legislative enactment to which this Court ought to pay deference. Instead, it argues that this Court should dismiss the case based on Sudanese and Canadian interests. As set forth below, neither of these interests is especially compelling, and the Court rejects Talisman's request to not assert jurisdiction in this case. The Court notes that international comity is a fundamentally discretionary act and is not obligatory. *See Bigio,* 239 F.3d at 454. *Cf. Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 457 (2d Cir.1985) ("Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation") (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3d Cir.1971)).[41]

### 1. Sudan's Interest in this Action Does Not Merit Granting Comity

Talisman argues that Sudanese interests in the adjudication of this case merit granting comity. As noted above, comity generally means deference to a foreign nation's legislative, executive, or judicial enactment. Talisman fails to indicate any specific enactment to which this Court should pay deference. Instead, Talisman implies that dismissal is warranted, because "[r]egardless of any criticism that has been levied against it for its domestic policies, [Sudan] is the legitimate and recognized government of that country with sovereign rights that warrant deference from other members of the international community." Motion Brief, at 22. In essence, Talisman argues that this Court is not in a position to judge Sudan's acts and that it should effectively mind its own business.

 This argument is incorrect.[42] Normally, comity entails a domestic court honoring a foreign court's judgment or dismissing a case in favor of a pending proceeding. *See, e.g., Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452 (2d Cir.1985) (affirming the grant of comity to a Swedish court decision staying creditor actions); *Allstate Life Ins. Co. v. Linter Group, Ltd.* 994 F.2d 996 (2d. Cir.1993) (affirming dismissal in favor of a pending proceeding in Australia). Talisman, however, asks this court to grant comity with regard to Sudan's allegedly genocidal acts. Such acts are fundamentally different than a foreign court's determination in, for example, a bankruptcy matter. Moreover,

**41.** Although the Court finds no merit in Talisman's assertion of Sudanese and Canadian interests in this case, it also notes that Talisman has provided no evidence (or even asserted) that Sudan and Canada would defer to a United States executive, legislative, or judicial decision if the situation were reversed. Such reciprocity is often an important factor in determining whether to extend comity to the acts of a foreign state. *See Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). *But see Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 460 (2d Cir. 1985) (holding that reciprocity, while it may be a factor, is not an essential element in granting comity).

**42.** Certainly, as a sovereign country, Sudan is potentially entitled to immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"). However, Talisman lacks standing to raise an FSIA defense on Sudan's behalf. Moreover, sovereign nations have been named as defendants in innumerable cases. In certain cases, the sovereign defendants are entitled to immunity; in others they are not. The issue of sovereign immunity is not squarely before the Court at this time, and it therefore need not make a determination of whether Sudan is immune from suit under the FSIA.

granting comity to allegedly genocidal acts violates the strong United States interest in addressing *jus cogens* violations through the ATCA. *See Wiwa*, 226 F.3d at 103–04. Second Circuit precedent indicates that comity need not be granted in such cases. *See id.; see also Pravin Banker Assocs. Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 ("No nation is under unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum.") (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984)).

Talisman also urges the Court to grant comity with respect to Sudanese remedies. However, as indicated above, Talisman has presented no evidence that plaintiffs could realistically expect to vindicate their rights in Sudan.[43] Assuming plaintiffs' claims to be true, as the Court must at this stage, Talisman would require plaintiffs to seek justice from the very regime that is conducting a genocidal campaign against them. Requiring plaintiffs to seek justice in the courts of an allegedly genocidal regime bent on their extermination would be a grotesque miscarriage of justice, and the case law concerning comity precludes such a result. *See, e.g., Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir.1997).[44]

Talisman also urges deference to Sudan's ongoing peace negotiations. Talisman fails to point to any specific enactment or process, however, to which this Court purportedly ought to pay deference. Instead, Talisman states that Sudan is in the midst of intense negotiations to resolve an ongoing civil war. The implication is that adjudication of this matter will somehow hinder these peace efforts.[45] Talisman does not specify how or why adjudication of this matter in this Court is a threat to ongoing efforts to resolve the Sudanese civil war. As noted *supra*, the civil war in Sudan has been raging on and off for decades.[46] The Court also notes Sudan has already been declared a state sponsor of terrorism by the United States government, and that the United States Congress has declared that Sudan has been conducting acts of genocide. *See* Amended Complaint, at ¶ 13; Sudan Peace Act, Pub.L. No. 107–245 (2002), at § 2(10). Any adjudication of private plaintiffs' rights in this Court would certainly have far less impact than either of these government pronouncements.

## 2. Canada's Interest in this Action Does Not Merit Granting Comity

Talisman also argues that comity should be granted in favor of Canada.

43. As noted above, plaintiffs do not even enjoy full legal personality in Sudanese courts.

44. Talisman also argues that exhaustion of local remedies is required under the ATCA. Whether or not the ATCA generally requires exhaustion of local remedies, the Court is aware of no case, nor does Talisman cite any, in which plaintiffs were required to exhaust local remedies in the courts of an allegedly genocidal state, where doing so would be futile and would put plaintiffs in great danger.

45. The Court is also in receipt of a letter from the Government of Sudan stating, *inter alia,* that the "adjudication in the United States Court will definitely compromise the serious efforts of the Sudanese Government to guarantee the safety of millions of civilians, and thus will adversely affect workers and those who are working to secure economic recovery [...]." Letter of Ambassador Khidir Haroun Ahmed dated December 26, 2002, appended to the Letter of Ambassador Omer Bashir Mohamed Manis dated December 27, 2002.

46. Lasting peace appears unlikely in the near future regardless of the actions of this Court. For example, a recent truce in Sudan was apparently violated ten minutes after it came into force. *See Sudan's "10 Minute Truce",* BBC News, Oct. 17, 2002, *available at* http://news.bbc.co.uk/2/hi/Africa/2337085.stm.

Again, it fails to articulate a specific enactment by the executive, legislative, or judicial branch of Canada that merits deferral. Talisman merely states that Canada has a "comprehensive policy of 'engagement'" that consists of participating in the U.S.-brokered Nuba Mountain ceasefire, opening a Canadian embassy office in Khartoum, and the appointment of two envoys to Sudan. Motion Brief, at 21; Declaration of Rajiv I.S. Manhas, at ¶ 17–18. While Talisman has demonstrated that Canada has a policy towards Sudan, it appears to be no more comprehensive than the United States policy towards Sudan. Given the lack of specificity, and the lack of any explanation as to how this case would blunt Canadian efforts to help achieve a resolution of hostilities in Sudan, the Court finds no basis to grant comity. Talisman also suggests that the Court should grant comity and defer to Talisman's internal Corporate Social Responsibility ("CSR") program. The doctrine of comity stems from deference and respect to other nations, not to private corporations. The doctrine of comity therefore does not extend to Talisman's CSR program.

## I. Dismissal is Not Warranted Under the Act of State Doctrine

Talisman moves to dismiss the action under the act of state doctrine. While ordinarily invoked by sovereign defendants, the doctrine may be invoked by private defendants in cases that call into question the legality of acts of a foreign government. *See O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 452 (2d Cir.1987). In its traditional formulation, the act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804

(1964). Although the doctrine has constitutional underpinnings, neither the Constitution nor international law require the act of state doctrine. *See id.* at 421–23, 84 S.Ct. 923. With respect to the ATCA, the Second Circuit has held that "it would be a rare case in which the act of state doctrine precluded suit under section 1350." *Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir.1995). Talisman argues that dismissal is required pursuant to the act of state doctrine because plaintiffs are challenging official government acts within Sudan's borders, and because the adjudication of plaintiffs' suit could hinder executive diplomacy and potentially contradict legislative decisions. For the reasons set forth below, neither argument is compelling.

### 1. The Court May Adjudicate Official Government Acts of Sudan

Under the act of state doctrine, courts "generally refrain from judging the acts of a foreign state with its territory." *Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir.1995). However, "it cannot of course be thought that 'every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Sabbatino*, 376 U.S. at 423, 84 S.Ct. 923 (citation omitted). Here, Talisman argues that dismissal is appropriate because plaintiffs' claims directly challenge "Sudan's uniquely sovereign rights to take military action during a civil war, to maintain civil order during a state of emergency, to control its natural resources and to raise and spend revenue." Motion Brief, at 23. The burden of proof lies with Talisman to justify the application of the doctrine. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *28 (S.D.N.Y. Feb. 28, 2002) (citing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976)); *Bi-*

*gio v. Coca–Cola Co.*, 239 F.3d 440, 453 (2d Cir.2000).

In determining whether to apply the act of state doctrine, the Supreme Court has embraced a sliding scale. The more clear-cut the alleged violation of international law, the less deference is due to the acts of a foreign sovereign, and vice-versa.

It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice.

*Sabbatino*, 376 U.S. at 428, 84 S.Ct. 923. In *Sabbatino*, a case cited by Talisman, the Supreme Court applied the act of state doctrine to a case in which Cuban authorities had expropriated certain property. The Supreme Court's decision was based in large part upon the great disagreement at the time over whether states violated international law by expropriating alien property. *See id.* at 428, 84 S.Ct. 923 ("There are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens."). The Second Circuit recently reiterated this view, stating that the act of state doctrine should be applied only "in a context [ . . . ] in which world opinion [is] sharply divided." *Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir.1995).

Notwithstanding Talisman's protestations to the contrary, the instant case does not challenge Sudan's right to prosecute a civil war or its ability to declare a state of emergency. Instead, the Amended Complaint alleges that Sudan committed acts of genocide, war crimes, enslavement, and torture. In marked contrast to *Sabbatino*, there are few if any issues in international law today on which opinion is so unanimous. This unanimity of opinion is reflected by the fact that under customary international law, states may exercise universal jurisdiction in prosecuting these acts. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 404 (1987). Talisman claims that the act of state doctrine does apply with respect to human rights violations, citing *Underhill v. Hernandez*, 168 U.S. 250, 254, 18 S.Ct. 83, 42 L.Ed. 456 (1897). That case, however, involved charges of unlawful detention and failure to grant a passport application. Neither of these acts constitutes a *jus cogens* violation of international law, and clearly neither is remotely akin to universally-condemned acts such as genocide, war crimes, enslavement, and torture. The second case cited by Talisman, *Riggs Nat'l Corp. & Subsidiaries v. Comm'r of I.R.S.*, 163 F.3d 1363, 1367 (D.C.Cir.1999), is even more inapposite. That case examined whether a United States court owed deference to a determination by the Brazilian Minister of Finance that the Central Bank of Brazil was required under Brazilian law to pay certain tax obligations. There is virtually no similarity to the instant case, and, regardless, *Riggs* did not involve allegations of *jus cogens* violations of international law. As noted *supra, jus cogens* violations are considered violations of peremptory norms, from which no derogation is permitted. Acts of state to the contrary are invalid. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 702 cmt. b (1987) (international law requires states to outlaw, *inter alia* genocide and slavery, and states refusing to enforce these prohibitions are responsible under international law); *id.* at cmt. n (international agreements in violation of *jus cogens* norms are void).

### 2. Adjudication of this Action Will not Hinder U.S. Foreign Policy

Talisman's second basis for dismissing this action on act of state grounds is that adjudication of this case could embarrass or hinder the foreign relations of the United States. *See* Motion Brief, at 24. For support, it cites two State Department daily press briefings and a newspaper article. *See id.* at 24. Each of these sources, however, states nothing more than that the United States is pursuing efforts to broker peace within Sudan and has engaged in dialogues with that country about terrorism. Talisman states that having a court sit in judgment of Sudanese governmental policy "may jeopardize" United States diplomatic efforts. Motion Brief, at 24. Talisman presents no factual or logical argument as to why the mere existence of certain U.S. diplomatic overtures towards Sudan should prevent this case from proceeding. Indeed, as the world's foremost superpower, the United States has complex diplomatic relationships with virtually every country. This fact, without more, does not militate in favor of dismissal. Nothing in Talisman's brief or exhibits supports its contention that adjudicating this case would have a detrimental effect on United States–Sudan relations.

■ Talisman alludes to congressional disagreement concerning the then-proposed Sudan Peace Act, and argues that this disagreement indicates the sensitive nature of foreign relations with Sudan. Since the briefs were submitted, the Sudan Peace Act, Pub.L. No. 107–245 (2002), was passed overwhelmingly by the House of Representatives and unanimously by the Senate and was signed into law by President Bush on October 21, 2002. The Sudan Peace Act includes a finding by the Congress that the acts of the Government of Sudan constitute genocide. *See id.* at

§ 2(10). The law also includes a lengthy condemnation of Sudan:

> The Congress hereby—
>
> (1) condemns—
>
> (A) violations of human rights on all sides of the conflict in Sudan;
>
> (B) the Government of Sudan's overall human rights record, with regard to both the prosecution of the war and the denial of basic human and political rights to all Sudanese;
>
> (C) the ongoing slave trade in Sudan and the role of the Government of Sudan in abetting and tolerating the practice;
>
> (D) the Government of Sudan's use and organization of "murahalliin" or "mujahadeen", Popular Defense Forces, and regular Sudanese Army units into organized and coordinated raiding and slaving parties in Bahr al Ghazal, the Nuba Mountains, and the Upper Nile and the Blue Nile regions; and
>
> (E) aerial bombardment of civilian targets that is sponsored by the Government of Sudan; and
>
> (2) recognizes that, along with selective bans on air transport relief flights by the Government of Sudan, the use of raiding and slaving parties is a tool for creating food shortages and is used as a systematic means to destroy the societies, culture, and economies of the Dinka, Nuer, and Nuba peoples in a policy of low-intensity ethnic cleansing.

*Id.* at § 4. In addition to these condemnations, the government of the United States has declared Sudan to be a state sponsor of terrorism. *See* Amended Complaint, at ¶ 13. Given the extensive condemnations that the United States government has already issued, any criticism of Sudan that would arise as a result of the adjudication of this case would be a mere drop in the bucket. In light of these facts, the Court declines to dismiss this action based on the act of state doctrine.

## J. This Action is Not Barred by the Political Question Doctrine

Talisman argues that the instant action should be dismissed because it raises nonjusticiable political questions. The Supreme Court has enunciated six factors to guide courts in determining whether controversies present nonjusticiable political questions:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Talisman argues that the instant action implicates factors 1, 2, 3, 4, and 6. *See* Motion Brief, at 25 n. 47. Specifically, it claims that this case is "unmanageable" because the acts alleged in the Amended Complaint occurred in the context of a complex civil war. However, Talisman ignores the fact that many cases in federal court involve complex facts, including those implicating complex civil wars. For example, *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995) was an action stemming from the complicated and bloody civil war in the former Yugoslavia. Despite the complexity of the underlying events and despite the sensitivity of the questions involved, the Second Circuit did not dismiss the case on the grounds that it presented nonjusticiable political questions. Moreover, the issues before the Court are not nearly as complex as Talisman makes them out to be. Contrary to Talisman's assertions, the issues in this case are not political. The Court's function is to determine whether Sudan and Talisman violated international law by committing certain acts. The standards of behavior under international law are judicially-ascertainable. The Court need not act as a truth and reconciliation commission and unravel the intricacies of Sudan's civil war.

Fortunately, the Second Circuit has provided clear guidance with respect to the application of the political question doctrine in the context of an ATCA suit alleging gross human rights violations. In *Kadic v. Karadzic*, the Second Circuit confronted a case in which several plaintiffs filed suit against Radovan Karadzic, the leader of the Bosnian Serb entity. The case was politically sensitive. Nonetheless, the Second Circuit rejected Karadzic's argument that the case be dismissed on the basis of the political question doctrine. In particular, the Second Circuit cautioned that "judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights." *Kadic*, 70 F.3d at 249. The Second Circuit added that "[a]lthough these cases present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions." *Id.* at 250.

The Second Circuit then examined each of the six *Baker* factors. With regard to the first factor (textual commitment to another branch), the Second Circuit held that an ATCA tort suit based on alleged gross human rights violations was constitutionally committed to the judiciary. *See Kadic*,

70 F.3d at 249. Similarly, in this case, plaintiffs seek a tort remedy under the ATCA for gross human rights violations. Resolution of such a matter is textually committed to the judiciary. With regard to the second and third factors (lack of judicially discoverable standards and the need for nonjudicial discretion), the Second Circuit held that "universally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating suits brought under the [ATCA], which obviates the need to make initial policy decisions of the kind normally reserved for nonjudicial discretion." *Id.* at 249. Such universally recognized norms of international law are also present in the instant case. With regard to the remaining factors (the impossibility to resolve the case without disrespecting other branches of government, the need to adhere to a previously-made political decision, and the potential to embarrass another branch of government), the Second Circuit held that *Baker* factors four through six would only be applicable if "judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Kadic,* 70 F.3d at 249. The Second Circuit concluded by again admonishing district courts not to assume that every case implicating foreign diplomacy raises a nonjusticiable question: "it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Kadic,* 70 F.3d at 250 (quoting *Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 229–30, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986)). The other major Second Circuit case to examine the political question doctrine in the context of a claim for an alleged violation of human rights also refused to order dismissal of the action. *See Klinghoffer v. S.N.C. Ac-*

*hille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44, 50 (2d Cir. 1991). In that case, several plaintiffs sued, *inter alia,* the Palestine Liberation Organization in connection with the hijacking of the passenger liner *Achille Lauro* and the murder of passenger Leon Klinghoffer. Notwithstanding the politically delicate nature of the case, the Second Circuit, examining the *Baker* factors, held that the political question doctrine was inapplicable. *See id.* at 50. Other courts, examining ATCA claims, have also rejected dismissal based on the political question doctrine. *See, e.g., Abebe–Jira v. Negewo,* 72 F.3d 844, 848 (11th Cir.1996).

The cases cited by Talisman purportedly supporting its assertion that the instant action presents political questions are not compelling. It cites *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 823 (D.C.Cir. 1984) for the argument that the internal conflict in Sudan "consists of a web that the courts are not positioned to unweave." The three judges in the *Tel–Oren* case, while agreeing on the result, each gave widely divergent reasons for their decisions. Talisman cites the opinion not of the D.C. Circuit but of Judge Robb, who argued in favor of dismissing the case on the basis of the political question doctrine. However, Talisman neglects to mention that Judge Robb's reasoning has been explicitly rejected by the Second Circuit: "Although we too recognize the potentially detrimental effects of judicial action in cases of this nature, *we do not embrace the rather categorical views as to the inappropriateness of judicial action urged by Judges Robb and Bork.*" *Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir.1995) (emphasis added). Finally, Judge Robb's decision in *Tel–Oren* was based in part upon the fact that, at that time, nations were "divisively split on the legitimacy of such ag-

gression as to make it impossible to pinpoint an area of harmony or consensus." *Tel–Oren,* 726 F.2d at 823 (Robb, J., concurring) (quoting *Tel–Oren,* 726 F.2d at 795 (Edwards, J., concurring)). In other words, it was unclear in 1984 as to whether or not terrorism violated international law. Whatever the validity of that position, it is clear that in 2003, acts such as genocide, war crimes, enslavement, and torture do violate customary (and codified) international law.

Talisman also cites *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 483 (D.N.J. 1999) for the proposition that the political question doctrine mandates dismissal of this case. The plaintiff in *Iwanowa* sought damages for forced labor during World War II. The court dismissed the case based in part on the political question doctrine. However, that case is readily distinguishable from the instant one. For example, in *Iwanowa,* the executive branch had declared that all World War II reparations should be dealt with in the context of a peace treaty or similar arrangement. *See id.* at 486. No such executive declaration has been made concerning Sudan. In *Iwanowa,* the United States had entered into an agreement with the German government to create a compensation fund for victims of forced labor. *See id.* at 488. No such agreement is present here. Finally, *Iwanowa* concerned claims that arose fifty years before the action was instituted. *See id.* at 489. Here, the events occurred only a few years ago and are ongoing.

■ The Court, having examined the Second Circuit authority above, and finding that the contrary cases cited by Talisman are not persuasive, declines to dismiss the instant action based on the political question doctrine.

### K. The Action Need Not be Dismissed for Failure to Join a Party

Talisman contends that the instant action should be dismissed pursuant to FED. R. CIV. P. 12(b)(7) and 19 because of plaintiffs' failure to join necessary and indispensable parties. In particular, Talisman argues that the Sudan People's Liberation Movement/Army ("SPLM/A"), Sudan, and the Greater Nile Petroleum Operating Company Ltd. ("GNPOC") are necessary parties for just adjudication in this litigation, because effective equitable relief cannot be accorded without their presence.[47]

### 1. The SPLM/A is Not a Necessary Party

Talisman argues that the SPLM/A is a necessary party under FED. R. CIV. P. 19(a)(1). According to that rule, a person subject to process and whose presence does not defeat jurisdiction shall be joined if "in the person's absence complete relief cannot be accorded among those already parties." FED. R. CIV. P. 19(a)(1). Talisman argues that because the SPLM/A is the lead rebel group, its presence is necessary because the allegations in the Amended Complaint are set in the context of a civil war between Sudan and the SPLM/A. It also argues that the injunctive relief asked for in the Amended Complaint cannot be accorded without the SPLM/A's presence.

■ The Court rejects Talisman's argument. The fact that the acts alleged may have occurred in the context of a civil war does not mean that all parties to the civil war are necessary. Moreover, Talis-

---

**47.** The SPLM/A is the main rebel group engaged in an armed struggle against the Suda-nese government.

man fails to explain why the SPLM/A is a necessary party if injunctive relief is be given. The only equitable relief sought is an injunction restraining defendants from continuing to cooperate or assist in waging "ethnic cleansing" against the non-Muslim, African Sudanese minority population. The Court fails to see how the SPLM/A is a necessary party in the context of this relief, especially given that the Amended Complaint does not allege any wrongdoing by the SPLM/A. Merely because the alleged acts occurred in the context of a civil war does not mean that all parties to that civil war are necessary. *See, e.g., Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.1995). The alleged violations of international law stem not from the fact that Sudan is fighting a civil war but from alleged acts of genocide, war crimes, enslavement, and torture. Consequently, the SPLM/A is not a necessary party.[48] Talisman appears to concede this point as it does not mention the SPLM/A in its reply brief.

### 2. Sudan is Not a Necessary Party

The Court notes that Sudan is named as a defendant in this case and has been served. Sudan has not formally entered an appearance, even to contest the Court's jurisdiction under the FSIA. The only response by Sudan to being served was a letter stating that it did not intend to participate in this action. *See supra* note 45. At this time, the Court has not determined whether or not Sudan is immune under the FSIA.

 Regardless, the Court finds that even if Sudan is found to be immune from suit under the FSIA, it is not a necessary party under Rule 19(a). *Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir.1998), which Talisman cites, is on point. In that case,

which involved two consolidated appeals, Ecuadorian plaintiffs, along with Peruvian plaintiffs who lived downstream, sued Texaco for certain environmental and personal injuries caused by its oil exploration activities between 1964 and 1992 and sought damages and "equitable relief to remedy the contamination and spoliation of their properties, water supplies and environment." *Jota*, 157 F.3d at 156. The Texaco subsidiary that had been conducting activities in Ecuador became wholly owned by Ecuador in 1992. The district court granted Texaco's motion to dismiss based on plaintiffs' failure to join an indispensable party—Ecuador.

The Second Circuit reversed the district court decision. While noting that "some aspects of the equitable relief sought by the plaintiffs would have required substantial participation by the Ecuadorian government," wholesale dismissal constituted an abuse of discretion and thus reversible error. *Jota*, 157 F.3d at 162. In particular, "since much of the relief sought could be fully provided by Texaco without any participation by Ecuador, dismissal of the entire complaint on Rule 19 grounds exceed[ed the district court's] discretion." *Id.* at 162. The same is true with respect to the instant action as well. The declaratory, compensatory, and punitive relief sought by plaintiffs does not *per se* require the participation of Sudan, if Sudan is immune from suit under the FSIA.

More importantly, the equitable relief sought by plaintiffs in this case is available without the participation of Sudan. Plaintiffs seek an injunction restraining defendants from continuing to cooperate or assist in waging "ethnic cleansing" against the non-Muslim, African Sudanese minori-

---

**48.** Plaintiffs also raise the question of whether the SPLM/A is an entity capable of being sued. Because the Court finds that it is not a necessary party, it need not answer that question.

ty population and from refusing to provide restitution. In their Amended Complaint, plaintiffs have identified the cooperation between Talisman and Sudan as the cause of their injuries. Even if Sudan is found to be immune, Talisman can still be enjoined, terminating the Sudan–Talisman nexus of cooperation. The equitable relief sought in this case would thus be effective even if only Talisman is a party. This differentiates the instant case from *Jota*. In that case, plaintiffs made a sweeping demand for equitable relief:

> The relief [plaintiffs] seek includes the following: undertaking or financing environmental cleanup, to include access to potable water and hunting and fishing grounds, renovating or closing the Trans–Ecuadorian Pipeline, creation of an environmental monitoring fund, formulating standards to govern future Texaco oil development, creation of a medical monitoring fund, [and] an injunction restraining Texaco from entering into activities that run a high risk of environmental or human injuries, and restitution.

*Jota*, 157 F.3d at 156 n. 2. It is obvious that much of this relief, such as the environmental cleanup, the access to water, and the shutting down of the pipeline would require the cooperation of the Ecuadorian government. In spite of that fact, the Second Circuit reversed a dismissal based on failure to join Ecuador, holding that the district court should have restructured the equitable relief to prevent the "ill effects of nonjoinder." *Id.* at 162 (citation omitted). In contrast to the comprehensive equitable relief sought in *Jota*, plaintiffs in this action seek a narrow and circumscribed injunction enjoining defendants from cooperating or assisting in committing certain gross human rights violations. In light of the fact that the Second Circuit reversed a Rule 19 dismissal where state cooperation was almost essen-

tial, this Court holds that, given the far more limited equitable relief sought here, Sudan's presence is not necessary as per Rule 19.

Another case directly on point is *Nat'l Coalition Gov't of the Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329 (C.D.Cal. 1997) *("Unocal")*. In that case, Unocal owned a 28.26 % stake in an oil exploration project in Burma. Plaintiffs alleged that the Burmese government, also known as the State Law and Order Restoration Council ("SLORC") had, in conjunction with Unocal, committed various human rights violations. *See id.* at 334. As in the instant case, the SLORC was alleged to have committed these gross human rights violations, including destroying villages, burning homes, forced labor, and torture in furtherance of an oil venture, of which Unocal was a member. Defendants sought to dismiss the case under Rule 19 because the SLORC had not been named as a defendant. Despite the fact that the SLORC itself had allegedly committed these acts on behalf of the joint venture (and by extension Unocal), the *Unocal* court refused to dismiss the action. As here, the *Unocal* court held that the SLORC was a joint tortfeasor whose presence was not required under Rule 19. *See Unocal*, 176 F.R.D. at 357 (citing, *inter alia, Temple v. Synthes Corp.*, 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990) (per curiam) ("it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit.")). As here, the *Unocal* court noted that "there is no reason complete compensatory relief may not be accorded among the remaining parties." *Id.* at 357. The *Unocal* court also based its decision in part on the fact that any injunctive relief sought against the defendants would be effective even in the absence of the SLORC. As noted, the same is true in the instant action. For these

reasons, the joinder of Sudan is not required under Rule 19. *See also Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 136–36 (E.D.N.Y.2000) (holding that France and Germany were not necessary parties under Rule 19 where plaintiffs sued French financial institutions for unlawful expropriations of Jewish customers' property during the Nazi occupation). Because the Court holds that Sudan is not a necessary party, and because at this point no ruling has been made regarding Sudan's immunity, the Court need not examine whether in "equity and good conscience" the action should proceed if Sudan were absent. FED. R. CIV. P. 19(b).

### 3. GNPOC is Not a Necessary Party

■ Finally, Talisman contends that GNPOC is a necessary party in this case. Talisman, through certain subsidiaries, is the owner of 25 percent of GNPOC. *See* Amended Complaint, at ¶ 7. Talisman argues that the Sudanese oil operations are conducted by GNPOC and that GNPOC is alleged to be cooperating with Sudan in committing the human rights violations complained of in the Amended Complaint. However, even a cursory reading of the Amended Complaint reveals otherwise. The Amended Complaint states that "Talisman is sued herein for its own actions and omissions as well as in its capacity as success in interest to Arakis [ . . . ] and as a member of [GNPOC]." Amended Complaint, at ¶ 3. Moreover, plaintiffs allege that "[a]fter GNPOC was formed, each of its constituent members took on specific areas or tasks." *Id.* at ¶ 19. The Amend-

ed Complaint concerns acts that allegedly occurred in areas in which "Talisman was the principal entity in charge of exploration [ . . . ]." *Id.* at ¶ 19. It would appear that although Talisman may have been working under the auspices of GNPOC, the acts or omissions listed in the Complaint were, with few exceptions, committed by Talisman itself.[49] Indeed, nearly every paragraph describes alleged unlawful acts by Talisman, not GNPOC.[50] *See, e.g.,* Amended Complaint at ¶¶ 26, 27, 29, 31, 32, 33, 36, 37, etc. Furthermore, plaintiffs seek damages and injunctive relief from Sudan and Talisman, not from GNPOC.

Talisman argues that any injunctive relief rendered against Talisman (and Sudan) would be meaningless in the absence of GNPOC. The Court disagrees. While GNPOC may be involved in human rights abuses in Sudan, the Amended Complaint alleges atrocities resulting from the cooperation of Sudan and Talisman, not Sudan and GNPOC *qua* GNPOC. The injunction sought by plaintiffs would terminate the Talisman–Sudan connection which is the source of the alleged harms outlined in the Amended Complaint. Talisman also argues that even if the Court could enjoin GNPOC, the relief sought would be incomplete because other energy companies have been granted concessions in Sudan. This objection is wholly academic because plaintiffs do not seek, nor need to seek, to enjoin GNPOC. Plaintiffs need not seek relief to remedy every potential human rights abuse in Sudan. The Amended Complaint identifies certain harms caused

---

**49.** Talisman's argument that Garbang in fact lived near an oil concession operated by Swedish and Austrian energy companies (and not Talisman) raises a factual question which cannot be resolved at this time.

**50.** To the extent that the Amended Complaint alleges acts by GNPOC, *see, e.g.,* Amended

Complaint, at ¶¶ 31, 35, 39, Talisman may potentially be held liable for the acts of other GNPOC members under a theory of joint venture liability. *See, e.g., Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.,* 909 F.2d 698, 701 (2d Cir.1990).

by Sudan and Talisman, and requests remedies to address those injuries. The fact that other energy companies may be involved in oil exploration (or human rights abuses) does not make them necessary parties under Rule 19. Talisman also argues that GNPOC's interests will not be protected in this litigation. However, as noted, the Amended Complaint seeks redress for alleged acts of Talisman and Sudan, not of GNPOC, and the declaratory, compensatory, punitive, and injunctive relief sought by plaintiffs is against those entities, not GNPOC.

Talisman argues that it would be prejudiced by disposition of this action without GNPOC's presence because Talisman would be unable to compel GNPOC to provide evidence or access witnesses that would be vital to defend this claim. Beyond this general statement, Talisman provides no specific information as to what evidence or which witnesses it would not be able to procure. In *Nat'l Coalition Gov't of the Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329 (C.D.Cal.1997), Unocal made an identical argument, stating that without the joinder of certain parties, it would be unable to conduct full discovery. *See id.* at 358 n. 35. Citing the absence of any evidence of this fact, the court in *Unocal* denied Unocal's motion to dismiss. *See id.* at 358. Moreover, in this case, as in Unocal, plaintiffs' discovery will be similarly impeded. *See id.* at 358 n. 35.

Finally, Talisman argues that GNPOC's interests would be prejudiced if the action proceeds without it. Talisman fails to explain with particularity how GNPOC would be prejudiced, given that plaintiffs seek relief solely from Talisman and Sudan. Regardless, if GNPOC were concerned about being prejudiced by the instant action proceeding without it as a party, it could move to intervene under Fed. R. Civ. P. 24. The fact that GNPOC has not

sought to do so belies Talisman's claim of prejudice.

**L. The Equitable Relief Sought Need Not be Dismissed**

Talisman argues that the equitable relief sought by plaintiffs should be dismissed on the grounds that equity will not require the performance of a useless act. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 744, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Marshall, J., concurring) ("It is a traditional axiom of equity that a court of equity will not do a useless thing [...].”). Talisman first argues that the Court lacks the power to enforce an injunction against Sudan. Given that Sudan has not yet entered an appearance, it is premature to consider this question. Moreover, as noted above, the proposed injunction would be effective even if it only bound Talisman.

Talisman's second argument is that Talisman "does not conduct business in Sudan and neither it nor its indirect subsidiary [...] controls GNPOC, the company conducting the oil operations in Sudan." This argument, to the extent it has not been addressed *supra*, is not ripe to be made at this time. The Amended Complaint, which the Court is obligated to credit at this time, alleges that Talisman is responsible for committing various unlawful acts in Sudan. Talisman's argument would require resolving a question of fact against plaintiffs, which the Court may not do at this stage. Talisman's ancillary argument, that it already has a corporate responsibility program in place to deal with the situation, is irrelevant. First, the injunctive relief requested has nothing to do with creating a corporate responsibility program. Second, the obvious implication of the Amended Complaint is that the corporate responsibility program has been ineffective in eliminating either Sudan's or

Talisman's role in committing atrocities in Sudan.

## IV. Conclusion

For the reasons set forth above, Talisman's motion to dismiss the Amended Complaint is DENIED.

**SO ORDERED.**